# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-00377 BAH** |
| **v.** | : | |
| | : | |
| **ANTHONY ROBERT WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE

Defendant Anthony Robert Williams (Defendant), who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Eastern District of Michigan.  Defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was

---

[1] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion.  *See United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Defendant traveled from Michigan to D.C. on January 6 and participated in the riot at the Capitol.  Defendant followed a mob of rioters who overran United States Capitol Police (USCP) officers on the Northwest stairs.  He then entered the Capitol building through the Senate Wing doors. Defendant joined a group of rioters in the Crypt and overran USCP officers there.  He then went to the Rotunda and was ultimately forced from there, and out of the Capitol building, by the police.  Altogether, Defendant was inside of the Capitol building for almost one hour.

Based on his actions on January 6, 2021, Defendant was charged with in a five-count indictment with violating the following statutes: 18 U.S.C. §§ 1512(c)(2), 2 (Obstruction of an Official Proceeding and aiding and abetting); 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted  Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds);  40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).  *See* ECF 13.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United*

*States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## I.   The Number of Federal Employees Who Reside in the District of Columbia Does Not Support a Presumption of Prejudice.

Defendant argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members. *See* ECF 40 at 4 - 5. But Defendant does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror. Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly affected. Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture at the time. And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote. There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be

impartial in this case.  *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at

*2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a

vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient

to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the

Court could draw a jury from those District residents who are not employed by the federal

government.  According to the Office of Personnel Management, around 141,000 non-Postal

Service employees worked in Washington, D.C., in 2017.  OPM, Federal Civilian Employment,

available   at   https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-

employment-reports/reports-publications/federal-civilian-employment/.      But   many   federal

employees who work in the District live outside the District and would not be part of the jury pool.

And  the  District  has  nearly  700,000  residents.   Thus,  even  if  every  federal  employee  were

disqualified, the Court would be able to pick a jury in this District.

## II.     The Impact of January 6 on Washington D.C. Does Not Support a Presumption of Prejudice.

Defendant contends that a D.C. jury could not be impartial because D.C. residents have

been particularly affected by events surrounding January 6, including the deployment of the

National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.  *See*

ECF 40 at 5 – 6.  But January 6 is now more than a year in the past.  Many D.C. residents do not

live or work near the Capitol where the roads were closed and the National Guard was deployed.

There is no reason to believe that the District's entire population of nearly 700,000 people was so

affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location

where they committed their crimes, despite the fact that some members of the community were

victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing);

*Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003)

(1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir.

2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In

*Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the

Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation

omitted).  "Although the widespread community impact necessitated careful identification and

inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task."

*Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by

January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

### III.   The District of Columbia's Political Makeup Does Not Support a Presumption of Prejudice.

Defendant contends that he cannot obtain a fair trial in the District of Columbia because

more than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential

Election.  *See* ECF 40 at 6 – 7.  The en banc D.C. Circuit rejected a nearly identical claim in

*Haldeman*, where the dissent concluded that a venue change was required because "Washington,

D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the

Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968

and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and

dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited

by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."

*Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting

the argument that "because of [the defendant's] connection with the Nixon administration and his

participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial

overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here.  The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial."  *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr.

6

16, 2020).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31.  Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

## IV.    The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

Defendant also contends that prejudice should be presumed based on pretrial publicity.  *See* ECF 40 at 7 – 12.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).  In *Rideau*, the defendant's confession—obtained while he was

in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice

should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias."  *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A.     Size and characteristics of the community

Defendant suggests that an impartial jury cannot be found in Washington, D.C., because it "is one of the smaller major US cities, with a population under 700,000."  ECF 40 at 3.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of

182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly

cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was

drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State*

*Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an

eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled."  *Id.*

### B.      Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the

type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S.

at 382. Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and

accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice.

As in *Skilling* and *Haldeman*, the news coverage of Williams is "neither as inherently prejudicial

nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."

*Id.*  Indeed, although any media characterizations of Williams would be inadmissible, the photos

and videos of Williams that have been disseminated would be both admissible and highly relevant

at trial.  *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was

"clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless

when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805

(9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible

at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial.");

*Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the

defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is

negligible.").

Defendant argues also that prejudice should be presumed based on statements by the

President, other political leaders, and judges.  *See* ECF 40 at 10 – 12.  But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice. Again, as noted in the *Skilling* decision, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.*  The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Anthony Robert Williams.  And, again, statements by the President, judges, and Members of Congress are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

Defendant also asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  *See* ECF 40, at 7.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6 has focused on Williams.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people.  The Court can guard against any spillover prejudice from

the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  Indeed, it appears that much of the news coverage of Williams has appeared in national news sources or Michigan-based outlets, rather than in local D.C. sources.[2]  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### C.   Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  In this case, 16 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than

---

[2] *See, e.g.*, "Judge shuts down accused Capitol rioter's request to travel to Jamaica with girlfriend," CBS News (Jan. 7, 2022), available at https://www.cbsnews.com/news/anthony-williams-january-6-capitol-riot-jamaica-request-denied/; "Jan. 6 Defendant Tried to Take Trip to Jamaica as He Awaits Trial for Alleged Involvement in Riot," People.com (Jan. 7, 2022), available at https://people.com/politics/judge-slams-capitol-riot-defendant-for-requesting-jamaican-trip-on-jan-6-anniversary/; "Michigan man bragged about storming U.S. Capitol during siege," The Detroit News (Mar. 26, 2021), available at https://www.detroitnews.com/story/news/local/michigan/2021/03/26/fbi-arrests-sixth-michigan-man-role-capitol-siege/7012962002/; "Southgate man charged in connection with deadly attack on US Capitol," Click On Detroit (Mar. 26, 2021), available at https://www.clickondetroit.com/news/defenders/2021/03/26/southgate-man-charged-in-connection-with-deadly-attack-on-us-capitol/

in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, as already mentioned, much of the reporting has been national is scope, rather than limited to Washington, D.C.

> **D.** **The jury verdict**

Because Defendant has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.[3]

> **V.** **A Change of Venue Is Not Warranted Under Federal Rule of Criminal Procedure 21(b) Based on Convenience or the Interest of Justice.**

Defendant argues, *see* ECF 40 at 13 - 17, that this Court should transfer venue to the Eastern District of Michigan under Rule 21(b), which allows transfer to another district "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). Defendant asserts that a change in venue will allow him to be closer to his family and his job and will allow him and his counsel to avoid travel costs. These arguments do not

---

[3] Defendant attaches to his motion a survey conducted at the request of the Federal Public Defender for Washington D.C. ECF 40-1. Defendant does not develop any argument based on that survey, but notes that his motion "is largely based on a similar motion filed in *United States v. Gieswein*, 21-cr-24 (EGS)." ECF 40 at 1 n.1. As explained in the government's supplemental response in *Gieswein*, that survey does not support a change of venue out of the District of Columbia. *See* ECF 107, *United States v. Gieswein*, No. 21-CR-24 (Feb. 28, 2022).

support a transfer of venue under Rule 21(b).

"There is a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (quoting *United States v. Baltimore & Ohio R.R.*, 538 F. Supp. 200, 205 (D.D.C. 1982)).  That presumption is rooted in the Constitution, which states that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  And it is reflected in the Federal Rules of Criminal Procedure, which state that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  To obtain a change of venue under Rule 21(b), a defendant must demonstrate that trial in the district where the crime occurred "would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome." *Bowdoin*, 770 F. Supp. 2d at 138 (quotations marks omitted).  Factors a court considering a motion to transfer venue are:

> (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district of division involved; and (10) any other special elements which might affect the transfer.

*Id.* at 137-38.  Those factors strongly support keeping the prosecution in this District.  The events at issue took place in the District of Columbia, and the majority of law enforcement witnesses are in this District.  Holding a trial in the Eastern District of Michigan would require a significant expenditure of government funds for the numerous District of Columbia witnesses to travel to that district.

Moreover, none of Defendant's reasons for transfer under Rule 21(b) support an interest of

justice transfer.  A trial in the Eastern District of Michigan would undoubtedly be more convenient for Defendant and his counsel.  But that fact alone is not sufficient to justify transfer, particularly considering that Defendant chose to travel to Washington, D.C. to commit his crimes at the U.S. Capitol.  *See Bowdoin*, 770 F. Supp. 2d at 138, 140 (observing that the defendant's location "is a very minor consideration" and concluding that the location of counsel was "evenly balanced between the parties"); *Jones*, 404 F.2d at 1240 n.43 (observing that Rule 21(b) is not intended to "facilitate removal of the proceedings to the accused's home district simply for the sake of getting it there, but to serve 'the convenience to the parties and witnesses'").  Although Defendant would undoubtedly prefer being tried in closer proximity to his job and family, ECF 40 at 15, those factors cannot outweigh the other factors that relate to Rule 21(b)'s core logistical concerns.  And the fact that one of the two assigned prosecutors has been detailed to the U.S. Attorney's Office for the District of Columbia from the U.S. Attorney's Office for the Eastern District of Missouri, ECF 40 at 15, does not support transfer to a completely different district that is not convenient for the witnesses or close to the location of the crime.  Defendant has failed to establish that he cannot receive a fair trial in this District, and Defendant has failed to articulate a basis for transfer under Rule 21(b).

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

*/s/ Anthony L. Franks*

ANTHONY L. FRANKS
Missouri Bar No. 50217MO
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
For the District of Columbia
Telephone No. (314) 539-3995
anthony.franks@usdoj.gov

GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-3276
Grace.E.Albinson@usdoj.gov