UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        Plaintiff,                        Crim. Action No. 21-377 (BAH)

v.

ANTHONY WILLIAMS,

        Defendant.
_____/

## REPLY REGARDING MOTION FOR TRANSFER OF VENUE

**1. Venue transfer is appropriate under Federal Rule Criminal Procedure 21(a).**

The government's response to Anthony Williams's motion for transfer of venue focuses on each factor he identified as reasons for transfer in isolation. But the factors under *Skilling v. United States*, 561 U.S. 358, 378 (2010), should be considered in combination in deciding whether to presume that a defendant cannot receive a fair trial in the charging jurisdiction. *See United States v. Casellas-Toro*, 807 F.3d 380, 386 (1st Cir. 2015).

Contrary to the government's arguments, those factors favor transfer. In addition to the reasons outlined in Anthony Williams's motion for transfer of venue, two additional surveys of potential jurors in Washington, D.C.—one by In Lux Research, the other by John Zogby Strategies—further confirm that venue transfer. (Exs. 1, 2.)

As to the size and characteristics of the population eligible for jury duty, the government concedes that the District of Columbia "may be smaller than most other federal judicial districts." (ECF No. 54, Resp., at 9.) Here the survey by In Lux Research becomes especially relevant. It examined other districts, and shows that, while the non-D.C. test areas registered remarkably similar results to each other, D.C. respondents were an outlier and had a "decidedly negative"

prejudice towards January 6 defendants. (Ex. 1, In Lux Survey, at 2.) Shockingly, "*91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%.*" *Id*. A whopping 30% of D.C. residents admitted to making every prejudicial prejudgment, double the rate of the next highest area. *Id*.



A significant finding in the survey was the elevated concern by D.C. residents about their safety in light of January 6. Respondents were asked: Have you experienced increased concern about your own safety or the safety of people important to you due to the Events of January 6th? The difference between the D.C. and the other areas is astounding:



The survey included four questions as to the personal impact January 6 had on the respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in neighboring Eastern District of Virginia. (Ex. 1, In Lux Survey, at 4).

It is not just political makeup that Mr. Williams is concerned about. The National Guard was deployed in D.C. for more than four months after January 6.[1] Mayor Bowser declared a state of emergency and implemented a 6 p.m. curfew for weeks subsequent to that day. The District implemented significant road and public space closures in direct response. The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists who were allegedly emboldened by the "mob assault" on the Capitol.[2]

The majority of potential jurors in the District of Columbia were *personally impacted* in some way by the events on Capitol Hill on January 6. (Ex. 1, In Lux Survey, at 4.) This factor

---

[1] NBC Wash. Staff & Ass. Press, *DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed*; NBC4 Washington, Jan. 17, 2021, https://perma.cc/H6LQ-Q5HE.

[2] Greg Myre, *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR, Jan. 28, 2021, https://perma.cc/SAD4-827T.

weighs heavily in favor of transferring this case. D.C. is a city that, as a whole, feels that it has been the victim of a crime. January 6 was a substantially more impactful event than Enron's collapse—the event at issue in *Skilling*—which personally affected a few hundred families in city of 4.5 million residents, who could easily be stricken from the jury pool. The fallout from January 6 has a far greater impact on the jury pool in Washington, D.C.—an impact that cannot be cured through jury selection alone.

As to adverse publicity, this situation rises above stories that are "not kind." *Skilling*, 561 U.S. at 382. The government cites *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976), as stating that even articles "hostile in tone and accusatory in conduct" will not cause inherent prejudice, but the court in *Haldeman* clarified that the "overwhelming bulk of the material submitted" had consisted "of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Id.* Here, in contrast, district residents have been exposed to thousands of comments from local and national leaders regarding January 6, related arrests, criminal charges and, more recently, prosecutorial outcomes. Unlike the Enron prosecution, January 6 is an ongoing event, with prosecutors still continuing to charge defendants. The negative publicity loop never stops, whereas in *Skilling*, four years went by before the trial took place, with little negative publicity.

Negative press coverage is guaranteed to continue for a long time. Congress's Select Committee has released a number of public statements about alleged "insurrectionists," "white supremacists," and "domestic terrorists."[3] Speaker Pelosi went so far as to declare that Donald

---

[3] Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA.

Trump was an accessory to murder.[4] Respectfully, Mr. Williams does not agree that January 6 was an "act of domestic terror," "a white supremacist attack," or an "insurrection." In fact, unlike D.C. residents, most Americans, as the surveys show, believe that January 6 was a very large protest that got out of hand and turned into a riot.

The In Lux Research survey asked respondents four questions related to news coverage in the tested areas. The survey revealed that D.C. is an outlier when it comes to saturation coverage. Only 4.83% percent of DC respondents said "never or almost never" in regard to following news coverage, compared to 13.40% said in the Eastern District of Virginia. (Ex. 1, Fig. 6.) D.C. residents have been inundated with coverage of the events surrounding January 6, are surrounded by residents who feel personally impacted by January 6, and clearly have been jaundiced towards Mr. Williams. The survey demonstrates that far fewer potential jurors outside the beltway are taking a personal interest in January as compared to their D.C. counterparts many of whom, according to the study, closely following January coverage.

*Skilling* also distinguished *Rideau v. Louisiana*, 373 U.S. 723 (1963), where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. Again, this factor weighs heavily in favor of relocating the trial from D.C. Ongoing negative publicity generated by congressional committees creates presumed prejudice for defendants. In fact, Mr. Williams respectfully submits that requiring him to go to trial in the District in the shadow of the Select Committee's investigation, would be highly prejudicial him. The First Circuit, for example, addressed the prejudicial effect of contemporaneous congressional hearings in *Delaney*

---

[4] *Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murder*, MSNBC.com, Jan. 19, 2021, https://perma.cc/9T9D-94G9.

*v. United States*, 199 F.2d 107 (1st Cir. 1952). In *Delaney*, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant. *Id*. at 114. The *Delaney* Court ruled that the trial judge abused his discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

> [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm.

*Id*. at 114.

The D.C. Circuit dealt with a similar issue during Watergate. Former Nixon official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge. Upholding the trial court's ruling, the D.C. Circuit distinguished *Delaney* on the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because it was a full year in the rear-view mirror:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United* States, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

The non-stop negative publicity requires the Court to either grant a lengthy continuance or transfer venue to a federal district that is not as impacted by the Select Committee's work. The instant case is far worse than *Delaney* and *Ehrlichman*. On top of the Select Committee, January 6 is reported on every day in local news. The one-year anniversary of the event, recent sentencings

and trials of high-profile January 6 defendants, have kept the matter in the forefront of local discourse. There are daily stories about the congressional investigation into the events of January 6, revealing new details, often with a political spin.

The In Lux Research survey found that while the tested areas differ from each other in geographic location, demographic composition, and political party alignment, the non-D.C. areas produced remarkably similar results to each other on most questions in the survey, with the D.C. standing apart. (Ex. 1, In Lux Survey, at 2.)

- "Q3. 72% of DC Community respondents said that they are likely to find Defendants guilty – even when given the choice, "It is too early to decide." The median in the Study was 48%.

- Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.

- Q6. 71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.

- Q9. Over 40% of the DC Community stated they believe all the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question. The median in the Study was 20%.

Also noteworthy are the results on preconceived beliefs that the January 6 defendants preplanned to go into the Capitol:



(Ex. 1, In Lux Survey, fig. 1.) Well over the majority, 71% of D.C. residents believe that the mayhem of January 6 was preplanned, whereas discovery has produced no evidence that Mr. Williams planned the Capitol breach or that he was aware that others planned to do so. This result is significant on the issue of intent, which is an essential element of a number of the charges. Mr. Williams would face a jury in the District of Columbia that overwhelming doubts a major defense, i.e., that there was no preplanning of January 6.

The survey also shows the significant percentage with which the District of Columbia surpasses the three other jurisdictions in terms of prejudgment of January 6 defendants:

> This bias is not only more prevalent in the DC Community, but it is also more intense. The DC Community also admits making more than one prejudicial prejudgment at a much higher rate than respondents from the other Test Areas. In fact, 30% of DC Community respondents admit that they have already made every prejudicial prejudgment tested for in the survey – double the rate of the next highest Test Area.

(Ex. 1, In Lux Survey, at 2.)

Another defendant also commissioned a survey by Zogby, Inc., a well-regarded polling company. (Ex. 2, as filed in *United States v. Garcia,* No. 1:21-cr-00129-ABJ, ECF No. 54-1, Filed 02/01/22.) This survey polled 400 D.C. residents in January 2022. The Zogby poll found that:

- 88% of registered D.C. voters believe that if the defendant went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder;

- 73% of respondents believed that anyone who merely entered the Capitol building on January 6 is guilty of insurrection;

- A majority (64%) of respondents believe that anyone who entered the Capitol building on January 6 is responsible for other protestors' violence and destruction of property;

- 70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

These surveys show prejudgment bias as to overall guilt and on the element of intent. Transfer of venue is required.

### 2. Venue transfer is proper under Rule 21(b) for convenience.

The government's opposition to venue transfer for convenience highlights that law enforcement witnesses are primarily in Washington, D.C. (ECF No. 54, Resp., at 13–15.) But this argument ignores the admonition in *United States v. Benjamin*, 623 F. Supp. 1204, 1212 (D.D.C. 1985), that"[t]he United States is ubiquitous." The Department of Justice is, "or should be, 'at home' not only in Washington, D.C.," but also in any other place "in which a federal court sits." *Id*. "In any federal district, the government lawyers have a built-in office, complete with local logistical support from parallel local staffs of the U.S. Attorney,  . . . and the FBI." *Id.* The government will not be unreasonably inconvenienced if Mr. Williams's trial is transferred to Michigan, especially given that the majority of the evidence is video footage that can be authenticated without requiring substantial travel.

### CONCLUSION

Mr. Williams requests that the Court transfer the case to the Eastern District of Michigan under Federal Rule of Criminal Procedure 21(a) and (b).

Respectfully submitted,

/s/ Benton C. Martin
/s/ James R. Gerometta
Federal Community Defender
Eastern District of Michigan
613 Abbott St., Suite 500
Detroit, Michigan 48226
Telephone:    (313) 967-5832
Email: Benton_Martin@fd.org

Date: May 6, 2022