UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CASE NO. 21-cr-00377- BAH |
| v. : | |
| : | |
| ANTHONY ROBERT WILLIAMS, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S
<u>MOTION TO TRANSFER VENUE</u>**

Defendant Anthony Robert Williams (Defendant) cites additional arguments and two surveys in his "Reply Regarding Motion For Transfer of Venue" in an attempt to validate transfer of venue to the Eastern District of Michigan. *See* ECF 60. Defendant still fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

**I.     Courts Have Repeatedly Declined to Find a Presumption of Prejudice Based on Pretrial Polling Without Conducting Voir Dire.**

Defendant attached to his original motion a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia in his Motion to Transfer Venue as supportive of moving venue to the Eastern District of Michigan. Because Defendant did not develop an argument based on that survey, but simply cited another defendant's filing in *United States v. Gieswein*, 21-cr-24 (EGS), the Government followed suit and cited its *Gieswein* response.

Defendant now relies on two additional polls conducted at the request of defendants in other cases. ECF 60 at 1-9. The first poll was conducted by In Lux Research ("ILR") at the request of defendants charged in another case. ILR conducted a telephone poll of potential jurors in the

1

District of Columbia and in four other jurisdictions: the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia. The second poll was an online poll of D.C. residents conducted by John Zogby Strategies at the request of a different January 6 defendant. Neither of these new polls supports a change of venue.

Defendant argues that the two additional polls "further confirm" that transfer is proper. ECFF 60, at 1. But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005). As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily

2

on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since

the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls. And Defendant has

not offered any reason to depart from that usual practice here. Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice. But, as explained below, the polls submitted by Defendant do not support a presumption of prejudice in any event.

**II.     The In Lux Research Poll Does Not Support a Presumption of Prejudice.**

Defendant argues that the ILR poll confirms his previous arguments that a D.C. jury could not be impartial by showing that D.C. respondents had a "'decidedly negative prejudice towards January 6 defendants." ECF No. 60, 2-3. This poll, however, is far from supportive of a presumption of prejudice.

The ILR survey's summary focuses on responses to "prejudicial prejudgment" questions. ECF No. 60-1 at 2. But those questions do not show that an impartial jury cannot be selected in this District. The questions categorized as "prejudgment questions" were:

(1) "Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?" (72% of D.C. respondents answered "Guilty.")

(2) "In your opinion, which of the following terms best characterizes the Events of January 6th? 1) An insurrection, 2) An attack, or 3) A riot (85% of D.C. respondents chose insurrection, attack, or riot.)

(3) "Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?" (71% of D.C. respondents selected "planned in advance.")

(4) "Do you believe The Events of January 6th were racially motivated?" (40% of D.C. respondents answered in the affirmative.)

5

ECF No. 60-1 at 8 (Figure 1), 21-22 (questions). The last three of these questions do not support a presumption of prejudice because they have little relevance to the potential issues at trial. The trial in this case would not require jurors to determine whether the events of January 6 were an "insurrection," an "attack," a "riot," or a "protest that got out of control." Indeed, no defendant has been charged with the offense of insurrection, 18 U.S.C. § 2383, or of violating the Anti-Riot Act, 18 U.S.C. § 2101, in connection with the events of January 6.

Nor would the charges in this case require the jurors to determine whether the defendant "planned in advance" to enter the Capitol or whether the crimes were "racially motivated." The fact that some D.C. respondents have formed "prejudgments" on those questions does not demonstrate that they cannot follow this court's instructions and decide this case based on the law and the evidence. And even if it did, the solution would be to exclude prospective jurors who indicated "prejudgments" during voir dire. The ILR survey shows that some percentage of respondents in *all* surveyed jurisdictions expressed these so-called "prejudgments." ECF No. 60-1 at 8 (Figure 1) (Questions 6 and 9) (between 39% and 49% of respondents in other surveyed jurisdictions thought entry into the Capitol was planned in advance, and between 11% and 20% believed the events of January 6 were racially motivated). This demonstrates that a careful voir dire would be necessary in any jurisdiction, and it fails to show that voir dire would be inadequate to weed out biased jurors in the District of Columbia.

Nor do the responses to the first "prejudicial prejudgment" question support a presumption of prejudice. That question asked respondents whether, in the abstract, they were "more likely" to find a defendant charged in connection with January 6 "guilty or not guilty." ECF 60-1 at 21 (Question 3). The question failed to ask about any specific crimes. And it failed to ask respondents whether they could keep an open mind and decide a case based on the law and the evidence if

selected as a juror. Yet the Supreme Court has made clear that the key question in jury selection is whether a prospective juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23.

When focusing on whether prospective jurors could set aside their "prejudgments" and decide a case fairly, the ILR survey's responses actually undermine Defendant's claim that prejudice should be presumed in this district. When those who were surveyed about their role as potential jurors and whether it would be "possible for you to be a fair and unbiased juror for a January 6th Defendant," ECF No. 60-1 at 23, a full 70.13% of D.C. respondents said that they "could," *id.* at 25 (Question 11). This number was actually *higher* than the affirmative responses in the other three jurisdictions: Middle Florida (61.29%), Eastern North Carolina (65.38%), and Eastern Virginia (69.52%). *Id.*

The ILR survey's administrator asserts that "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality." ECF No. 60-1 at 5. But the survey's findings do not justify that assertion. The administrator claims that because D.C. residents were more likely to characterize the events of January 6 as an "insurrection," "attack," or "riot," or to believe they were criminal, pre-planned, or racially motivated, *id.* at 22, 25, those residents "demonstrate[d] an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror," *id.* at 5. But this assumes, contrary to clear decisions from the Supreme Court, that any knowledge of or preconceived opinions about a case make a juror unable to be impartial. *See Reynolds*, 98 U.S. at 155-56; *Irvin*, 366 U.S. at 723. It also assumes that these jurors would fail to report these views to a judge during voir dire. Particularly because the ILR survey had already asked respondents specific questions that the survey claims showed "prejudicial prejudgment," there is no reason to believe that D.C.

7

respondents were somehow unable or "unwilling[]" to report their own biases when asked if they could be impartial.

When asked if their "neighbors would be fair and unbiased jurors for a January 6th Defendant," D.C. respondents still answered "Yes" at a higher rate than the other surveyed districts. ECF No. 60-1 at 23, 26 (Question 12) (53.25% in D.C., compared to 36.57% in Middle Florida, 45.10% in Eastern North Carolina, and 40.89% in Eastern Virginia). Thus, even when controlling for respondents' potential inability to discern their own biases, the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions. Nor were D.C. respondents significantly more likely to worry about negative consequences to their career or friendships if they were to "find[] a January 6th defendant Not Guilty." *Id.* at 22, 26 (Question 10) (19.29% in D.C., compared to 17.68% in Middle Florida, 19.66% in Eastern North Carolina, and 18.56% in Eastern Virginia).

Defendant also argues that transfer is appropriate because 66% of the respondents from D.C. who took the IRL survey indicated that they have increased concern about their safety or the safety of others important to them due to the events of January 6th. ECF No. 60 at 2. The responses to this question, however, do not support a presumption that impartial jurors cannot be found in the District of Columbia. The question fails to elicit the reasons for and extent of the respondents' safety concerns, which would be relevant in determining the potential effect on their impartiality. Such responses would be likely in any jurisdiction that experienced a violent or dangerous crime, yet violent crimes and terrorism-related offenses are regularly tried in the districts where they occur. And substantial numbers of respondents in *all four* surveyed jurisdictions expressed increased concern for their safety or the safety of others. *See* ECF No. 60-1 at 25 (Question 8) (27.07% in Middle Florida, 32.88% in Eastern North Carolina, and 36.67% in Eastern Virginia).

8

The appropriate way to address the potential impact of these concerns on juror impartiality—in any jurisdiction—is through voir dire. The ILR survey does not support the conclusion that an impartial jury cannot be found in Washington, D.C.

Defendant also argues that the ILR poll's "four questions related to new coverage" indicate that "D.C. is an outlier when it comes to saturation coverage." ECF 60 at 5. As an initial matter, Defendant has not requested transfer to any of the ILR survey's three comparator jurisdictions—the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia. Instead, the defendant has requested a transfer to the Eastern District of Michigan. The ILR survey tells the Court nothing about the views or media exposure of prospective jurors in that district. The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendant's preferred district. *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll demonstrates that that respondents in all four jurisdictions surveyed were aware of the events of January 6 at similar rates. ECF No. 60-1 at 24 (Question 1) (93.12% of D.C. respondents "aware of" the demonstration at the U.S. Capitol, compared to 94.07% in Middle Florida, 91.60% in Eastern North Carolina, and 94.27% in Eastern Virginia). The survey also shows that respondents' media or conversational exposure to the events of January 6 did not vary significantly between jurisdictions. The survey asked respondents how often they "see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you." *Id.* at 21 (Question 4). The percentage of respondents reporting "[a]t least

9

10 times a week" was only slightly higher in D.C., with a response rate of 32.02%, compared to rates between 25% and 28% in the other three jurisdictions. *Id.* at 24. And the percentage of D.C. respondents answering "[s]everal times a week" or "[o]nce or twice a week" were generally within one or two percentages points of respondents from other jurisdictions. *Id.* (41.09% of D.C. respondents reported exposure "[s]everal times a week," compared to 39.82%, 39.30%, and 34.58% in the other jurisdictions, and 22.05% of D.C. respondents reporting exposure "[o]nce or twice a week," compared to 20.66%, 22.68%, and 23.99% in the other jurisdictions). The survey thus confirms that exposure to reports of the events of January 6 is not confined to D.C., and the relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C. Voir dire can adequately identify those D.C. residents who were so affected by press coverage of focused on the events of January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.

**III.   The Zogby Poll Does Not Demonstrate Pervasive Prejudice in the District of Columbia.**

Defendant also relies upon a poll conducted by John Zogby Strategies at the request of another January 6 defendant, Gabriel Garcia, to support a presumption of prejudice. In fact, there are particularly strong reasons to doubt that poll's reliability. For one thing, the poll does not provide the Court with all the information needed to assess its accuracy. The American Society of Trial Consultants' Professional Standards for Venue Surveys state the following:

> The trial consultant's presentation of survey results to a court shall include [t]he questionnaire that was used in the survey, identification of the primary persons who performed the work (including their qualifications), and descriptions of how each of the following standard steps for conducting a survey was completed:
> - Design of the survey instrument.
> - Determination of eligibility and sampling measures.
> - Training of interviewers and supervisors to conduct the interviewing.
> - Interviewing procedures.
> - Dates of data collection

10

      - Calculation of sample completion rate.
      - Tabulation of survey data.

American Society of Trial Consultants (ASTC), Professional Standards for Venue Surveys at 7, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

      The Zogby poll fails to provide critical information, such as how the 400 survey participants were selected for the vaguely described "online survey" and whether they self-selected. ECF No. 60, Exhibit 2 at 2. *See United States v. Thomley*, No. 2:18-CR-18-KS-MTP, 2018 WL 5986754, at *2 (S.D. Miss. Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they selected their sample. Did they obtain responses online or via social media? Did respondents self-select?"). Additionally, the explanation that is provided indicates that the poll was underinclusive, in that it was only of "Washington DC registered voters," ECF No. 60-2 at 2, whereas this Court's jury pool is generated based on voter registration, Department of Motor Vehicles records, and D.C. income tax forms. Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors at 1, available at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf.

      Moreover, the Zogby poll uses a number of compound, non-neutral, and leading questions. *See Campa*, 459 F.3d at 1131-32, 1146 (affirming district court's decision to reject venue survey that used "ambiguous" and "non-neutral" questions). For example, Question 8 asked respondents which description of January 6 "comes closer to your opinion," giving options only for (A) "a dire threat to the fabric of our nation and . . . the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War" or (B) "unwise and caused senseless damage to the Capitol building and people's lives, some of which were lost, but the events were not insurrectionist and did not pose a threat to US democracy." ECF No. 60-2 at 6. These answers, in addition to being

11

compound, forced respondents into a binary choice between extreme options. For example, there was no choice for someone who believed the events *did* pose a threat to U.S. democracy but did not approach the level of 9/11, Pearl Harbor, or the Civil War. Nor was there a choice for someone who believed the events did *not* pose a threat to U.S. democracy but was also unwilling to describe them as "unwise" or "senseless."

The survey's next question asked whether respondents believed that "any individual who was inside the US Capitol on January 6, 2021 should be convicted of insurrection." ECF No. 60-2 at 7. This question is poorly worded, considering that hundreds of "individual[s] who w[ere] inside the US Capitol on January 6" had every right to be there, including the Vice President, the members of Congress, and the U.S. Capitol Police and U.S. Secret Service. Moreover, the question provided no background on potential criminal offenses involved in the events of January 6 other than "insurrection"—which the question does not define or describe, *see* 18 U.S.C. § 2383, and with which no defendant has been charged in connection with the events of January 6. And the setup for this question naturally prompted respondents to condemn the actions of January 6 rather than to consider whether they actually believed everyone who entered the Capitol without permission was an insurrectionist. In short, these questions have the earmarks of an inappropriate "push poll" that is "primarily designed to influence survey respondents' opinions in a particular direction by presenting systematically biased information." ASTC Professional Standards for Venue Surveys at 7; *see id.* at 8 ("Efforts should be made to avoid context, wording or other influences that raise the likelihood of responses due to social desirability or other response bias."); *Campa*, 459 F.3d at 1146 (observing that "the survey was riddled with non-neutral questions").

In addition, the Zogby poll is particularly unhelpful in determining whether transfer is warranted because it fails to provide a comparison with the defendant's preferred venue, the

Eastern District of Michigan, or any other district. According to the poll, 54% of respondents indicated their views about January 6 were shaped more by national media sources, compared to only 39% that were shaped by more local media sources. ECF No.60-2 at 5. Thus, the Zogby poll fails to establish that the views of D.C. voters are substantially different than potential jurors in other jurisdictions. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest). Indeed, the defendant may be *less* well known in Washington, D.C. than in Eastern District of Michigan, where there has been local coverage of the defendant. As noted in the Government's Response in Opposition to Transfer Venue, it appears that much of the news coverage of Williams has appeared in national news sources or Michigan-based outlets, rather than in local D.C. sources.[1]

Even if the Zogby poll's results are taken at face value, the poll does not support a presumption of prejudice in this district. Defendant asserts that "88% of registered D.C. voters believe that if Gabriel Garcia went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder."[2] ECF 60-2 at 11. In fact, the Zogby poll

---

[1] *See, e.g.*, "Judge shuts down accused Capitol rioter's request to travel to Jamaica with girlfriend," CBS News (Jan. 7, 2022), available at https://www.cbsnews.com/news/anthony-williams-january-6-capitol-riot-jamaica-request-denied/; "Jan. 6 Defendant Tried to Take Trip to Jamaica as He Awaits Trial for Alleged Involvement in Riot," People.com (Jan. 7, 2022), available at https://people.com/politics/judge-slams-capitol-riot-defendant-for-requesting-jamaican-trip-on-jan-6-anniversary/; "Michigan man bragged about storming U.S. Capitol during siege," The Detroit News (Mar. 26, 2021), available at https://www.detroitnews.com/story/news/local/michigan/2021/03/26/fbi-arrests-sixth-michigan-man-role-capitol-siege/7012962002/; "Southgate man charged in connection with deadly attack on US Capitol," Click On Detroit (Mar. 26, 2021), available at https://www.clickondetroit.com/news/defenders/2021/03/26/southgate-man-charged-in-connection-with-deadly-attack-on-us-capitol/

[2] As with the question about "insurrection," the question makes no effort to inform respondents about what is required for the government to prove the relevant criminal offenses. *See* 18 U.S.C. § 1512(c)(2) (obstruction of justice); 18 U.S.C. § 231(a)(3) (civil disorder).

shows that this belief was held by 125 (88%) of the 143 respondents who were (a) familiar with the events of January 6 *and* (b) familiar with the Proud Boys *and* (c) familiar with Garcia himself. ECF No.60-2 at 41 (125 of 143). When the respondents who lacked this familiarity are accounted for, the percentage of overall respondents believing Garcia should be convicted if he entered the Capitol falls to 31%. *Id.* at 42 (125 of 401). That is hardly sufficient to support a presumption of prejudice.

The defendant contends that the Zogby poll shows that "73% of respondents believed that anyone who merely entered the Capitol building on January 6, 2021 is guilty of insurrection." ECF 60 at 8. In fact, the Zogby poll showed that 73% of respondents who were "Very familiar" or "Somewhat familiar" with January 6 held this belief. ECF No. 60-2 at 40. (277 of 380 respondents). When respondents who were "Not familiar/Not sure" are taken into account, the percentage falls to 69%. ECF No. 60-2 at 41 (277 of 401 respondents). And this does not raise a presumption of prejudice. In *Patton v. Yount*, nearly 99% of prospective jurors had heard of the case, and 77% indicated on voir dire that "they would carry an opinion into the jury box," yet the Supreme Court rejected a claim of presumed prejudice. *Patton*, 467 U.S. at 1029. Thus, the number of poll respondents who had formed a general opinion about January 6 defendants was lower than in *Patton*, even though the Zogby poll did not ask respondents whether they could set aside their opinions and determine guilt based solely on the evidence if called as jurors. *Compare Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part) (61% of survey respondents held the opinion that defendants were "guilty" in connection with Watergate even when provided a survey option for "Not Guilty Until Proven"). At most, these responses indicate the Court might have to call a somewhat larger venire in order to find 12 impartial jurors; they do not demonstrate that it is impossible to pick an unbiased jury.

The defendant discusses a variety of other findings from the Zobgy poll, many of them variations on the findings just discussed—such as that "[a] majority (64%) of respondents believe that anyone who entered the Capitol building on January 6 is responsible for other protestors' violence and destruction of property" and that "70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president." ECF No. 60 at 8. But all these findings suffer from the same flaw—they fail to show a level of bias against the defendant so high that this Court can presume prejudice, forgo voir dire, and transfer venue to another jurisdiction. In fact, the Zogby poll fails to provide *any* information about prospective jurors' familiarity with and prejudice toward the defendant in this case.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

**IV.    The Voir Dire Process in the First January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.**

At this point, four other January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be

15

selected, that fact should become evident at the voir dire"). Instead, the judges presiding over each of those trials was able to select a jury in one or two days. *See United States v. Reffitt*, 21-cr-32, Minute Entries (D.D.C. Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34-CRC, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022) And although the government does not yet have transcripts from the *Thompson* trial, the voir dire in the other three cases undermines the defendant's claim that prejudice should be presumed.[3]

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt* Trial Tr. 521. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt* Trial Tr. 23, 30. The Court then followed up during individual voir dire and qualified ten prospective jurors who had answered one or more of those bias questions affirmatively but who clarified during individual questioning that they could decide the case fairly and impartially.[4] Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[5]

---

[3] The transcripts from the voir dire proceedings in *Reffitt*, *Robertson*, and *Webster* are being submitted under separate cover to the Court and counsel.

[4] *Reffitt* Trial Tr. 60-61 (Juror 1541); 87-88 (Juror 1332); 104-06 (Juror 457); 162-65 (Juror 1486); 188, 191-94, 201 (Juror 1675); 289-90, 297-98 (Juror 365); 301-03, 307-09 (Juror 38); 326-33 (Juror 1655), 427-31 (Juror 344), 436-40 (Juror 1221).

[5] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484). For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson* Trial Tr. 302. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Id.* at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. As in *Reffitt*, the Court followed up on affirmative answers to those questions during individual voir dire, and of the 12 prospective jurors who raised potential concerns about their partiality during voir dire, the Court qualified two who indicated that they could, in fact, be impartial, and struck one for a different reason.[6] Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[7]

Most recently, in *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 Tr. at 6. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*

---

(Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[6] *Robertson* Trial Tr. 23-26 (Juror 1566, struck based on hardship), 64-73 (Juror 254, qualified); 130-36 (Juror 1219, qualified).

[7] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160). For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

4-25-22 Tr. at 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at at 32-33, 41-42, 54-56, 63, 65-66. The presiding judge observed that the Court was able to "qualify 35 jurors after questioning 53 of them" and that only "about 50 percent" of the 18 people stricken for cause were stricken based on an expressed inability to be impartial, as opposed to a connection to the offense. *Webster,* 4-26-22 Tr. at 6-7. This means that approximately 9 out 53 prospective jurors (or about 17%) were stricken based on an inability to be impartial, as opposed to some other reason. The Court also observed that "the actual number of folks that were stricken for cause based on their representation that they couldn't be fair and impartial was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Id.* at 7.

In these first few trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these January 6-related trials— between 16% and 18% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the

18

qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first few January 6-related trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case. The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

## V.   A Change of Venue Is Not Warranted Under Federal Rule of Criminal Procedure 21(b) Based on Convenience or the Interest of Justice.

Again, Defendant argues that this Court should transfer venue to the Eastern District of Michigan because the majority of the evidence in this case is electronic, the "United States is ubiquitous," and the Department of Justice is "at home" in any place "in which a federal court sits." ECF 60 at 9 (quoting *United States v. Benjamin*, 623 F. Supp. 1204, 1212 (D.D.C. 1985)). But the case upon which Defendant relies was a tax case involving a "federal income tax enforcement proceeding in California" involving a California organization and nine defendants, eight of whom lived in California. *Benjamin*, 623 F. Supp. at 1212. Five of the defendants' six attorneys were based in California, but the government was represented by two Department of Justice attorneys "whose duty and practice is to try case in any federal court in the United States." *Id.* The case's only connection to Washington D.C. arose from the fact that "ultimate IRS administrative review and judicial review of that decision are . . . only available in D.C." *Id.* at 1213. And the court's decision to transfer the trial was "informed, if not controlled, by Congress' stated preference that tax prosecutions should be brought as close to the defendant's residence as possible." *Id.* at 1212 (quotation omitted). That case is a far cry from this one, in which the crime occurred in the District of Columbia and the majority of the fact witnesses are based in the District. Defendant cannot show that transfer is appropriate under Rule 21(b).

## CONCLUSION

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

*/s/ Anthony L. Franks*
ANTHONY L. FRANKS
Missouri Bar No. 50217MO
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
For the District of Columbia
Telephone No. (314) 539-3995
anthony.franks@usdoj.gov

GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-3276
Grace.E.Albinson@usdoj.gov