# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-377 BAH** |
| **ANTHONY ROBERT WILLIAMS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

> "Operation Swamp Storm veteran now lol modern day tea party. Was proudest day of my life lol felt like the founding fathers were smiling down on us in that room, and I guarantee my dad and gramps, both vets, would be proud."

Government's Trial Exhibit 9.33 (statement of defendant Anthony Robert Williams, posted on Facebook on January 9, 2021, regarding the January 6 riot).

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Anthony Robert Williams to 64 months' incarceration, the midpoint of the sentencing guidelines range in this case, three years of supervised release, $2,000 in restitution, and the mandatory special assessment for each of the five counts of conviction.

## I.    INTRODUCTION

Anthony Robert Williams, a 47-year-old painter who resides in Southgate, Michigan, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police

1

officers, and resulted in more than 2.7 million dollars' in losses.[1]

Williams' participation in the riot was purposeful, extensive, enthusiastic, and remorseless. After the 2020 presidential election, Williams issued a series of social media posts expressing his anger that Donald Trump lost, and stating his intention to go to the Capitol on January 6  and "Hold the Line" to stop the certification of the election results. Williams followed through on his words and went to the Capitol on January 6. There, Williams joined a group of rioters on the West Front where he helped them climb bicycle racks to flank and overrun the police on the Northwest stairs. Williams recorded himself on those stairs and bragged, "[w]e just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper-sprayed, and hit everybody. Fuck that, we took this fucking building." He then stole water bottles United States Capitol Police (USCP) officials had stored on the Upper West Terrace of the Capitol building to be used for decontamination if USCP officers were hit with chemical irritants.

Williams entered the Capitol through the Senate Wing doors only 6 minutes after they were initially breached. He then overran the police in the Crypt with other rioters. Williams advanced to the Rotunda where he celebrated with other rioters and smoked marijuana. When the police tried to force Williams out of the Rotunda, he joined with other rioters and actively resisted and mocked the police. Williams followed his rioting at the Capitol by bragging on social media about his actions, expressing no remorse, and proclaiming that January 6 was the proudest day of his life.

The government recommends that the Court sentence Williams to 64 months' incarceration, the midpoint of the advisory Guidelines range of 57-71 months, which the

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

government submits is the correct Guidelines calculation. A 64-month sentence reflects the gravity of Williams's conduct and his lack of remorse for his actions.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Williams among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As established at trial, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 presidential election. Trial Tr. at 83, 6/29/22, afternoon session. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice-President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

Trial Tr. at 85-86, 6/29/22, morning session. *See* Government's Trial Exhibit 16.0.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials. Trial Tr. at 56-59, 6/28/22, morning session.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting the police officers along the way. Trial Tr. at 60-61, 6/28/22, morning session.

Shortly after approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. *See* Government's Exhibit 2.12. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Government's Trial Exhibit 16.0

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a

grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than one hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others

on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

> ### *i.      After the Election, Williams Proclaims that He Was Going to the Capitol to "Storm the Swamp" and "Hold the Line" For Donald Trump on January 6, 2021*

The evidence at trial showed that Williams was angry that Donald Trump lost the 2020 presidential election and that he was determined to go to Congress to overturn the results on January 6, 2021.  At trial, Williams testified that throughout the 2020 presidential election

6

campaign, on an hourly basis, he was on "conversative-leaning" websites like "Fox News, Gateway Pundit and a social media website called Patriots.win." Trial Tr. at 27-28, 6/29/22 afternoon session. With the backdrop of the defeat of his candidate, Williams unleashed a torrent of angry, conspiracy-themed, and militaristic posts in social media, including on Patriots.win and Facebook. Williams made it clear that he disputed the election results, thought Donald Trump won, was going to do anything possible to stop the certification of Joe Biden as the President, and proposed violence towards those who had engaged in fraud or treason. *See* Government's Exhibits 9.0, 9.1, 9.3, 9.4, 9.6, 9.9, 9.10, 9.11, 9.12, 9.13, 9.14, 9.15, 9.21, 10.2, 10.4, 10.5, 10.8. He also encouraged others to join him in Washington, D.C. on January 6th to "Hold the Line" and "Storm the Swamp" for Donald Trump. *See* Government's Exhibits 10.3, 10.7.

Williams began his series of rants on November 4, 2021 with posts laced with militaristic terms of "HoldTheLine" and "NoSurrenderNoRetreat," coupled with "Trump2020" hashtags and claims of how "the Establishment" was going to steal Wisconsin and how the media was suppressing alleged Trump wins in Georgia and Pennsylvania. He also referred to Joe Biden as "#Pedojoe." *See* Government's Trial Exhibit 9.0. Over the next days, Williams's intensified his claims and coupled them with threats that, "[p]ayback is gonna be a motherfuc*er! We coming for ya commies! #HOLDTHELINE #NoRetreatNoSurrender # TRUMP2020". *See* Government's Trial Exhibit 9.1.

On November 20, 2021, Williams suggested that the Democratic party had been caught stealing votes "and may end up hung for treason, because we caught em RED handed." *See* Government's Trial Exhibit 9.7. On November 24, 2021, Williams again proposed hanging as punishment for alleged treason committed during the election stating, "This is no longer about

hating the Orange Man Rad. This is about betraying our election process at treasonous levels. Levels that at any other time in our Country's fine history would have you swinging from the end of a rope. #Trump2020 #HOLDTHE LINE". *See* Government's Trial Exhibit 9.8.

By November 25, 2021, Williams had transitioned from anger to action. He posted on Patriots.win his plans to go to D.C. for "TRUMPS Inauguration" and invited others to travel there by convoy. *See* Government's Trial Exhibit 10.3

On December 12, 2021, Williams's vitriolic posts concerning punishment for alleged election fraud continued. He posted on Facebook, "if Biden drops fine w me lol" . . . "hes compromised by ccp anyways…beats hanging or firing squad" . . . "btw we'll take to war, would probably last 2 weeks." *See* Government's Trial Exhibit 9.15. Williams followed these posts on December 15, 2021 claiming that he was "MAGA til the bloody end." *See* Government's Trial Exhibit 9.17.

On December 16, 2021, Williams focused on the certification of the 2020 Electoral College vote count, providing a detailed analysis of the process and how it would culminate in D.C. on January 6, 2021 in Congress. *See* Government's Exhibit 9.18 .

**Time** 2020-12-16 05:10:38 UTC
**Type** Comments
**Summary** Anthony R. Williams replied to a comment on a post from December 15, 2020.
`@[1135670941:2048:Chris Willenbacher] Dec. 14 — Electors cast their ballots for president and vice president then send certificates of their vote to various officials, including Vice President Mike Pence, serving as president of the Senate. Dec. 23 — President of the Senate receives electoral vote certificates Pence must receive the formal electoral vote certificates no later than nine days after electors meet. Jan. 6 — Congress counts electoral votes The House and Senate convene for a joint session on Jan. 6 to count electoral votes. Pence presides over the process as president of the Senate and announces the results. The candidate that receives at least 270 out of 538 electoral votes becomes the next president. Any OBJECTIONS(contested results) to the electoral votes must be submitted in writing and signed by at least one House and one Senate member. If an objection arises, the two chambers consider the objection separately.`
**Object Id** S: I1220550733:10222050627471454:99

8

Three days later, on December 19, 2021, Williams affirmed his intent to go to D.C. to "Storm the Swamp," forwarding a post from former President Donald Trump. *See* Government's Trial Exhibit 9.19. The same day, Williams posted in Patriots.win, "THE TWEET HAS BEEN SENT!! JAN 6TH!!" *See* Government's Exhibit 10.6.

On December 29, 2021, Williams again expressed his anger and his intention to go to Congress, stating, "yep, we pissed and we comin to Congress." *See* Government's Trial Exhibit 9.21. On December 30, 2020, Williams again posted his intentions, both on Facebook and Patriots.win, to go to D.C. on January 6.   On Facebook he reposted a message former President Donald Trump posted on Twitter stating, "JANUARY SIXTH, SEE YOU IN DC!"   *See* Government's Trial Exhibit 9.22. Williams followed by posting in Patriots.win that he was going to D.C. to "Storm the Swamp." *See* Government's Trial Exhibit 9.23.

On December 30, 2020, Williams also posted in Patriots.win instructions on "EXFIL ROUTES" from D.C., referencing a militarist term for evacuating troops from battle. Four minutes later on Patriots.win, Williams reiterated his intention to take action in D.C. He belittled those who limited their protest to social media, declaring , "Fuck the mask, we're FREE MEN, but Our Country is being stolen right in front of our eyes, and most mfrs won't do shit but get online and whine  . . .well FUCK THAT! I'm headin to D.C. to save the Republic with all you crazy patriotic hell raisers. See ya there man! #HOLDTHE LINE". *See* Government's Trial Exhibit 10.8.

On January 4, 2021, Williams posted on Facebook that he was leaving for D.C. the next morning, that he was staying in Crystal City, Virginia, and that it was "Gonna BE WILD!!"  See Government's Exhibit 9.25.

### ii.   Williams Goes to D.C. to "Storm the Swamp" and "Hold the Line"

Williams drove with his friends from Southgate, Michigan to D.C. on January 5, 2021.

Trial Tr. at 44, 6/29/22, afternoon session. Williams said that he went there because he thought

Trump "was going to drop receipts, or evidence, at the rally, in front of the whole media." Trial

Tr. at 45, 6/29/22, afternoon session.  As he traveled to D.C., Williams posted that he was in

Bedford County, Pennsylvania.  Williams and his friends arrived in D.C. the night of January 5,

2021 and stayed in a hotel in Crystal Gardens, Virginia. Trial Tr. at 49, 6/29/22, afternoon

session. Williams followed with a series of posts on January 6, 2021 informing his Facebook

friends that he was in D.C. and at the Capitol.  *See* Government's Trial Exhibit 9.26.

At trial, Williams testified that on January 6, 2021, he and his friends went to the

National Mall, but they could not get into the Trump rally at the Ellipse because they did not

have tickets.  Trial Tr. at 51, 6/29/22, afternoon session. They could, however, hear Rudy

Giuliani's and Trump's amplified speeches. Trial Tr. at 51, 6/29/22, afternoon session.  Williams

testified that he heard Trump tell the audience to march to the Capitol. Trial Tr. at 51, 6/ 29/22,

afternoon session. Williams's said that he and his friends marched towards the Capitol between

1:30 p. m. and 1:45 p.m. Trial Tr. at 52, 6/ 29/22, afternoon session. Williams approached the

Capitol from its Northwest side.  Trial Tr. at 52, 6/29/22, afternoon session.

### iii)  Williams Helps Rioters Access the Police on the Northwest Stairs

The USCP had placed a series of interlocked bicycle racks to serve as barriers to prevent

rioters from accessing Capitol grounds and the Capitol. On direct examination, Williams testified

that he was only looking at the bicycle racks. Trial Tr. at 53, 6/29/22, afternoon session.

Q: We've seen video of you with the bike racks. Tell us what you were doing with the
bike racks.

10

A: I was just looking at them, seeing what was going on it. Was kind of a little overwhelming because the amount of crush of people -- the amount. Not the crush, the amount.

Trial Tr. at 53, 6/29/22, afternoon session.

A video recorded by another rioter, which was admitted into evidence at trial, revealed more. *See* Government's Trial Exhibit 3.3. On cross examination, Williams conceded that he was helping people climb the bicycle racks so that he and other rioters could access the Northwest stairs.

Q: Were you trying to help people climb up the bike rack?

A: In the last shot I was.

Q: Why?

A: Just so we can get up and protest at the stairs.

Trial Tr. p. 75, 6/29/22, afternoon session.

Below is a screen shot of Government's Trial Exhibit 3.3A, which shows Williams at the bottom of Northwest stairs where he helped rioters ascend the Northwest stairs.



Video evidence revealed what Williams initially resisted admitting; he helped other rioters climb the bicycle racks to gain access to the Capitol building, as shown below:



*Still shot from Exhibit 3.3.*

Capitol Police Captains Matthew Tighe and Ronald Ortega testified at trial that the bicycle racks were set up to establish the restricted perimeter, protect the inaugural stage, and prevent rioters from entering the Capitol.  Trial Tr. at 38-39, 6/28/22, morning session; Trial Tr. at 28, 6/29/22, morning session.

Captain Ortega also testified that he witnessed rioters working in tandem, as Williams was doing with the bicycle racks, to climb the Northwest stairs where the police were overrun. Captain Ortega also testified that rioters used the bicycle racks like battering rams against the police. All of these actions posed a threat to the officers who were on the Northwest stairs. Trial Tr. at 21, 6/29/22, morning session. While Williams was at the bottom of the Northwest stairs, rioters who were near Williams surrounded officers of the D.C. Metropolitan Police (MPD) and yelled

obscenities at them. *See* Government's Trial Exhibit 3.3. A screenshot from Government's Trial

Exhibit 3.3. captures this chaotic scene below:



Williams testified that his fellow rioters were then "in a shoving match with the Capitol police officers" and at that point his fellow civilians were "rioting." Trial Tr. at 88, 6/29/22, afternoon session. As the assault on the police persisted, Williams continued to help others access the Northwest stairs where the Capitol Police were posted.

At 2:09 p.m., the rioters broke the police line at the middle of the Northwest Stairs. *See* Government's Trial Exhibit 2.1. Two minutes later, at approximately 2:11 p.m., Williams celebrated with the mob of rioters with fist-pumps, having successfully pushed past the police on the Northwest stairs. Williams then went up the stairs, stopped at the middle landing, and banged on the doors of the inaugural stage with his Trump flag. *See* Government's Trial Exhibit 2.2.

At approximately 2:16 p.m., Williams recorded a video on the Northwest stairs where he boasted that, "*We just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper sprayed, and hit everybody. Fuck that, we took this fucking building.*" *See* Government's Trial Exhibit 4.1.

### iv) *Williams Steals the Police Officers' Water Bottles*

Williams then ascended the stairs to the Upper West Terrace. In Government's Exhibit 4.1, the video that he recorded on the Northwest stairs, Williams can be heard stealing and handing out the water bottles belonging to the Capitol Police. Captain Ortega testified that this water had been placed in that location so officers could use it to wash out their eyes in the event of being hit with tear gas. Trial Tr. at 16, 25, 6/29/22, morning session. CCTV captured an officer using the water to decontaminate his eyes on the Northwest stairs. *See* Government's Trial Exhibit 2.1.

In a video recorded by another rioter, a screen shot of which is shown below, Williams is

captured stealing the water bottles. *See* Government's Trial Exhibit 5.4.



***Still shot of Government's Trial Exhibit 5.4.***

### v)  *Williams Breaches the Capitol with The First Wave of Rioters*

From the Upper West Terrace, Williams went with the mob to the Senate Wing doors.

Williams is shown in another video just outside the Senate Wing doors as the alarm for the doors

can be heard blaring. *See* Government's Trial Exhibit 3.5. The Capitol building was first

breached at the Senate Wing, which is on the first floor of the building. Rioters breached this

area at approximately 2:13 p.m. by violently busting the windows with a wooden board and then

breaking open an emergency exit door. *See* Government's Trial Exhibit 2.3. Williams entered the

Capitol through the Senate Wing door at 2:18 p.m. with the first large wave of rioters to breach

the Capitol. As he did, alarms blared and broken glass was visible on the floor, clearly

evidencing the chaos and violence that had just occurred there.  *See* Government's Trial Exhibit

16

2.3.  Below is Government's Exhibit 2.3A showing Williams shortly after he breached the Capitol looking towards the busted window and broken glass on the floor.



Months later, on July 14, 2021, Williams bragged on Patriots.win, "Well, at least I got in with the first batch of Patriots on Jan 6th!" See Government's Exhibit 10.19.

### vi)  Williams and the Mob Overrun the Police in the Crypt

After entering the Capitol, Williams proceeded to the Crypt, which is also on the first floor of the building. He recorded his path to the Crypt as rioters beat on doors, and chanted "traitor," "whose house? Our house!", and "USA."  *See* Government's Exhibit 4.2.  When Williams entered the Crypt, he immediately walked through the large crowd to the front of the group of rioters who were confronting a line of Capitol Police officers; the officers were trying to prevent the rioters from advancing further into the building. *See* Government's Exhibits 2.5, 4.2. Williams recorded himself   proudly   standing   near   the   front   of   the   crowd.   *See*   Exhibit   4.2.

Video from another rioter captured Williams and other rioters menace the police in the

Crypt.  *See* Government's Trial Exhibit 5.0.   A still shot below from that video shows Williams's proximity to the police line in the Crypt as he waves his American flag,



United States Capitol Police Officer Juan Lopez (Officer Lopez) testified at trial that Williams was within 5 to 10 feet from him when Williams stood near the police line. Trial Tr. at 50, 6/29/22, morning session.  At approximately 2:25 p.m., Williams and the other rioters overran the police in the Crypt. *See* Government's Trial Exhibit 2.6. Once Williams and the crowd breached the police line, the police were forced to retreat. Williams was now within 2 to 5 feet of Officer Lopez as the crowd stampeded the police and Officer Lopez was forced against a column. Trial Tr. at 46, 50, 6/29/22, morning session.  *See* Government's Exhibit 5.0.



*Still shot of Government Exhibit 5.0*

### vii) V.P. Pence is Evacuated Because of the Rioters Advancement Through The Capitol

Paul Wade, the Assistant to the Secret Service Special Agent in Charge, testified at trial that the continued advancement of the rioters through the Capitol posed a risk to Vice-President Pence:

> Q: And if you wouldn't have eventually moved the Vice President, what could have happened with regard to your position?
>
> A: The fear was that the rioters, protesters – again, mixed group – that if they took over that first floor, we could be trapped up on that second floor, without a way to get down. Now, there are some other areas, but based on the breaches in the building, it wouldn't have been safe to move to other areas of the building.
>
> Trial Tr. at 14-15, 6/29/22, afternoon session.

At approximately 2:26 p.m., while Williams and other rioters were seizing control of the Crypt, the Secret Service had to evacuate Vice-President Pence, his staff, and his family from the second floor of the Capitol; the next portion of the Capitol that Williams advanced to with the

mob.



***Still of Government's Exhibit 2.12 - Vice-President Pence's Evacuation at 2:26 p.m.***

Agent Wade explained that he could hear the rioters on the first floor as they evacuated

Vice-President Pence.

Q: As you went down those stairs, did you hear anything or see anything that was out of
the normal?

A: So, at the bottom of the staircase is the first floor of the Capitol building, and at the
bottom of that staircase, when I stopped and had looked up at the Vice President, I could
hear, from around the corner, loud screams and yelling, as if the folks breaching the
building were getting close.

Q: And on the first floor would be the Crypt?

A: Yes, sir. Yeah, the breach – one of the breach areas was the Senate wing door, which is
north of the Crypt, but in that same hallway.

Tr. Trans. at 17, 6/29/22, afternoon session.

### viii)  Williams Goes to the Rotunda Where He Celebrates and Resists the Police

After thwarting the efforts of the police in the Crypt to keep the rioters at bay, Williams went to the Rotunda, entering it at approximately 2:33 p.m.   At this point the Certification proceeding was halted because the rioters had breached the Capitol.   During joint sessions of Congress, the Vice-President and members of Congress would normally pass through the Rotunda to go to the House and Senate chambers. Agent Wade testified that when he was protecting Vice-President Pence while the rioters occupied the Capitol, "to go towards the Rotunda would not be a safe move with the information we had." Tr. Trans. at 18, 6/29/22, afternoon session.

Having advanced to the Rotunda, Williams reveled in his triumph by waving his flag, taking selfies, and joining with other rioters who were smoking marijuana. Williams exclaimed, "Trump 2020 baby" to a fellow rioter who filmed the group smoking.  *See* Government's Trial Exhibit 5.2.

Williams also recorded himself in the Rotunda. He bragged about how "*we took this fucking building,*" and that "you gotta do whatchu [sic] gotta do when shit gets fucking desperate*,*" . . . "*desperate times, desperate measures …Trump 2020 motherfucker*." *See* Exhibit 4.3.

Williams conceded at trial that he was pleased with his actions at this point.

Q: You're saying that – after you've taken over the Capitol, "Trump 2020"?

A: I said that's, yes, what I said, "Trump 2020."

Q: And you said that after you smoked weed on the other side of the Rotunda, right?

A: Yes, sir.

Q: "Trump 2020"?

A: Yes, sir.

Q: All right. You were very happy about what you did at this point?

A: Yes, sir.

Trial Tr. at 109, 6/29/22, afternoon session.

The MPD joined the Capitol Police in the Rotunda to assist with forcing the rioters out of

the Capitol. Instead of voluntarily leaving, Williams joined with other rioters and actively

resisted the police's commands and pushed back against them.  On direct examination, however,

Williams denied doing so.

Q:   Did you push against cops when you were leaving?

A:   I did not. I was being pressed between people.

Q:   Tell me about that.

A:   Like I said, they were trying to push everyone out a small door, and that whole room,
as you've even [seen] in the videos, was filled with people. So to get that many people
through that little doorway took some effort, and then we also -- there was still people
coming in through that doorway.

Trial Tr. at 59, 6/29/22, afternoon session.

On cross examination, Williams admitted that he was resisting in the Rotunda, but then

qualified that response by attributing his resistance to being in a crowd that was resisting:

Q:    Resisting when they were telling you to go from the Rotunda?

A:   I was in a crowd that was resisting because of the crowd size.

Q:   So you were resisting

A:   It looked like that, yes.

Q:   No. Were you resisting? You, like, kind of almost there. But, were you resisting?

A:    I was not specifically resisting because I was in a crowd of people and I could not
move and the crowd was pushing from both directions: I was sandwiched.

Trial Tr. at 111, 6/29/22, afternoon session.

22

Williams, however, was captured in another rioter's video and shown resisting the police as he locked arms with another rioter. *See* Government's Exhibit 3.0.

Officer Lopez, who was involved in this struggle with the rioters, testified unequivocally that Williams resisted the police in the Rotunda:

> Q: Officer Lopez, how would you describe the behavior - - the actions of this person in the circle?
>
> A: The person in the circle is actively resisting.
>
> Q: How so?
>
> A: They are pushing back towards the police line that's trying to push the person out of the Rotunda.
>
> Trial Tr. at 56, 6/29/22, morning session.

Williams not only resisted the police, but he mocked them when they tried to force him out of the Rotunda, yelling to them to "social distance." *See* Government's Trial Exhibit 1.0.

The police finally forced Williams out of the Rotunda at 3:13 p.m.  From there he left the Capitol Building through the Rotunda doors at approximately 3:16 p.m., waving his flag to the crowd of rioters outside of the building. *See* Government's Trial Exhibit 2.19.  In total, Williams spent nearly a full hour in the Capitol, from 2:18 p.m. to 3:16 p.m. while the Certification was halted.

### ix) *After the Riot, Williams Bragged on his Social Media Accounts About Rioting at the Capitol*

After the riot, Williams took to social media to celebrate his participation in the insurrection. On Facebook, he posted photos of himself in the Capitol and the video of himself on the Northwest stairs, boasting that he "stormed the stairs of the Capitol." Williams also spread false information on Facebook claiming that there was no violence at the Capitol.  He also pronounced that January 6 "was the proudest day" of his life. *See* Government's Trial Exhibits

23

9.32A (Williams posts, "The PEOPLES house #NoRetreateNoSurrender"), 9.32b (Williams

posts on Facebook the video in which he is on the Northwest stairs announcing that "we just

stormed the stairs of the Capitol. . . ."); and 9:33 (Williams posts on Facebook, "Operation

Swamp Storm veteran now lol modern day tea party. Was proudest day of my life lol felt like the

founding fathers were smiling down on us in that room, and I guarantee my dad and gramps,

both vets, would be proud.").

Williams also falsely claimed on Facebook that the police let people into the Capitol. In

his posts he also noted that he hoped that, "since the numbers are so high" that the police would

"only go for ppl attacking police and breaking windows . . ." *See* Government's Trial Exhibit 9.34.

Although in January 2021 Williams might have been concerned about being charged, he

still showed no remorse for his illegal behavior at the Capitol. Even after he was arrested by the

FBI, Williams boasted in Patriots.win  that he stormed the Capitol.  On April 6, 2021, Williams

posted, "Swear on mi [sic] life it did. I also stormed the Capitol, and got popped by [sic] the FBI

2 weeks ago- so Im not one for making up stories. MAGA since the escalator." *See* Government's

Trial Exhibit 10.10.

A few days later, on April 19, 2021, Williams affirmed his defiant stance in Patriots.win,

stating, "I was in the Capitol and have absolutely no remorse or fear in saying or doing it." *See*

Government's Trial Exhibit 10.13, 4/19/21.  Williams went further and touted his overrunning of

the police in the Crypt and resisting them in the Rotunda, stating on Patriots.win, "I 'passed thru'

the Crypt then held the Rotunda." *See* Government's Trial Exhibit 10.14.

Finally, in a series of posts in May 2021, Williams attempted to justify breaching the

Capitol, claiming that he was there to protect the building from Antifa, while also falsely claiming

inaction by the police. *See* Government's Trial Exhibits 10.16, 10.17, 10.18.  Clearly, Williams went to the Capitol on January 6, not to confront Antifa, but to "Hold the Line," "Storm the Swamp," and stop the Certification, actions which he forecasted for months in his social media; and that's what he did.

## III.    THE CHARGES

On May 26, 2021, a federal grand jury returned an indictment charging Williams with the following: Count One: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2; Count Two: Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Three: Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Count Four: Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Five: Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). On June 30, 2022, a jury found Williams guilty of all charges of the indictment.

## IV.    STATUTORY PENALTIES

Williams now faces sentencing on all five counts of the indictment upon which he was convicted. Williams is subject to a maximum of twenty-three years in custody (20 years for 18 U.S.C. 1512(c)(2), a Class C felony; one year for each of two Class A misdemeanors charged and six months for each of two Class B misdemeanors charged); a term of probation of not more than five years for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3561(c); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2), for the Class C felony and one year for each of the two Class A misdemeanors; a fine of not more than a total of $460,000 ($250,000 for the Class C felony pursuant to 18 U.S.C. § 3571(b)(3) and (d), $100,000

for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3571(b)(5) and $5,000 for each

of the two Class B misdemeanors pursuant to 18 U.S.C. § 3571(b)(6)); and  special assessments

totaling $170 ($100 for the Class C felony, $25 for each of the two class A misdemeanors pursuant

to 18 U.S.C. § 3013(a)(1)(A)(iii), and $10 for each of the class B misdemeanor pursuant to 18

U.S.C. § 3013(a)(1)(A)(ii)).

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at

49.

The government concurs with Probation that the Sentencing Guidelines offense level is 25,

but disagrees with Probation about how that offense level is calculated. The Guidelines set out the

specific "order" of the analysis:  first, determine the offense guideline; second, determine the base

offense level and apply any appropriate specific offense characteristics, cross references, and

special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.  U.S.S.G. §

1B1.1(a)(1)-(3).  Then, repeat each step for each count.  U.S.S.G. § 1B1.1(a)(4).  Finally, perform

the grouping analysis in Part D of Chapter 3.  *Id.*

In the draft pre-sentence report ("PSR") The Probation Office did not employ this specified

procedure in determine the total combined offense level. Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 28-38, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count One, PSR ¶¶ 39-48. The appropriate offense level computations for Counts One, Two, and Three prior to any grouping analysis under Part D of Chapter 3, are as follows:

**Count One: 18 U.S.C. § 1512(c)(2) and § 2—attempted to and aided and abetted the obstruction of an official proceeding before Congress**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| | **Total** | **25** |

**Count Two: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds**

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Trespass at a Restricted Building/Grounds | +2 |
| U.S.S.G. §2B2.3(c)(1) | Adjusted base offense level committed with the intent to commit a felony requires application of U.S.S.G. §2X1.1(a) | 25 |
| | **Total** | **25** |

**Count Three: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| | **Total** | **10** |

**Counts Four and Five: 40 U.S.C. § 5104(e)(2)(D) and (G)—Disorderly conduct in a Capitol building and parading, demonstrating or picketing in a Capitol building**

Counts 4 and 5 are Class B misdemeanors to which the Sentencing Guidelines do not apply.

27

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(d). The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. 3D1.3(a). Since Counts One and Two have the highest offense levels for any count in the group, the offense level for the group is 25. Since there is only one group, the total adjusted offense level is the level for that group: 25. Although the Probation Office did not perform all of the foregoing calculations, it concluded that the combined total offense level in this case is 25. PSR ¶ 48.

Even though Williams has three juvenile delinquency adjudications, PSR ¶¶ 49-51, and eight adult criminal convictions, including for burglary and arson, PSR ¶¶ 51-59, the Probation Office calculated Williams's criminal history as category I because of the advanced age or minor nature of those convictions, PSR ¶ 60.[2] The government does not dispute that recommendation. Accordingly, based on the government's calculation of Williams's total adjusted offense level at 25, Williams's Guidelines imprisonment range is 57 to 71 months' imprisonment. PSR ¶ 123.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and charact]eristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities

---

[2] Williams was arrested on fourteen other occasions that did not lead to a conviction. PSR ¶¶ 62-75.

among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Williams's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement;

and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Williams's statements in social media prior to the riot demonstrate that he went to D.C. to obstruct the Certification. Williams clearly knew when and where the Certification was going to take place. He used militaristic terms in his social media like "Hold the Line" and "No Retreat, No Surrender" suggesting that he was ready for combat at the Capitol and welcomed and encouraged it.

Once he was on Capitol grounds, Williams's actions followed his words. He saw the police being assaulted and then assisted a legion of his fellow rioters by using bicycle racks to help them access the Northwest stairs where they overran the police. Reporting from a war scene, Williams recorded a video on the Northwest stairs and posted it on Facebook announcing the mobs' conquest, stating, "*Fuck that, we took this fucking building.*" Williams then breached the Capitol with the first large wave of rioters. He remained inside for almost an hour, overrunning the police in the Crypt, celebrating by smoking marijuana in the Rotunda, and recording another video, explaining how "desperate times" had called for the "desperate measures" of taking over the "fucking building" [for] "Trump 2020." All this underscored Williams's corrupt intent to obstruct the Certification. He then actively resisted and mocked the police when they tried to force him from the Rotunda. Williams then celebrated his participation in the riot for months on social media, showing no remorse or contrition for his actions. Instead, he boasted about being one of the first to breach the Capitol and overrunning the police in the Crypt and resisting them in the Rotunda.

Williams's' conduct demands a lengthy sentence of imprisonment.

### B.  Williams's History and Characteristics

Williams is 47 years old and **r**esides in Southgate Michigan. PSR ¶  90.

Williams's crimes on January 6 were not an isolated event in an otherwise law-abiding life.  Williams's criminal convictions are remote in time, but significant in scope. They were incurred from 1990 up to 2008, and include convictions for burglary, arson, criminal trespass, disorderly conduct, battery/bodily harm[3], resisting peace officer, criminal damage to property, possession of marijuana, alcohol by minor, driving on suspended license, and illegal possession/transport liquor.  PSR, ¶¶ 49 - 59. Williams also had a number of arrests in Cook County, Illinois from 1992 to 2006, which were "stricken" . . . "with leave to reinstate", indicating that the court may have sentenced Williams to a form of probation. PSR, ¶¶ 63 - 73. Williams was arrested in August 2020 in Michigan and charged with being a disorderly person for allegedly being asked to wear a mask at a bar, refusing to do so, yelling obscenities, and getting into an altercation. The police reported that Williams was uncooperative and belligerent towards them. The charges were later dismissed. PSR ¶ 75**.**

Williams's actions on January 6, with his disorderly conduct, overrunning and resisting the police, and other illegal acts on Capitol grounds, are similar to some of his previous convictions. Also, while the conduct which was alleged to have occurred when Williams was arrested in 2020

---

[3] The Government has provided to Probation copies of certified convictions Williams incurred in 2003 for disorderly conduct/battery bodily harm and resisting peace officer along with copies of certified convictions Williams incurred in 2005 for criminal damage to property. The Government previously produced these to the defense. The Government anticipates that Probation will incorporate these convictions in the final PSR as they were not included in the draft PSR and are not in dispute.

did not result in a conviction, the charges are similar in tone with his angry social media posts regarding January 6, especially one on Patriots.win regarding wearing of masks during the COVID pandemic. *See* Government's Trial Exhibit 10.8 ("Fuck the mask, we're FREE MEN . . . .")

In any event, Williams's extensive criminal history supports a Guidelines range sentence. His criminal conduct on January 6, 2021 and his utter contempt for the law is of a piece with his long history of illegal and hostile behavior.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Williams's criminal conduct in corruptly obstructing of an official proceeding, and bragging about, is the epitome of disrespect for the law.

While Williams was at the bottom of the Northwest stairs, it was abundantly clear to him that the police were under siege as rioters overwhelmed, outnumbered, and surrounded them. Nonetheless, Williams helped rioters flank and overrun the police who were at the top of the stairs. To exacerbate the challenges the police faced in defending themselves, Williams stole the water bottles that had been placed at the top of the stairs for police decontamination.  He then breached the Capitol with the first large wave of rioters who entered the Capitol and remained inside for

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

almost an hour as the Certification was halted.

Once inside the Capitol, Williams was hardly a passive observer of the criminal conduct of others. He overran the police in the Crypt, celebrated in the Rotunda by smoking marijuana there, and then actively resisted police officers' commands to leave the Rotunda and mocked them. In sum, the rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the

---

[5] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Months after the riot, Williams proclaimed publicly on social media that, "I was in the Capitol and have absolutely no remorse or fear in saying or doing it." *See* Government's Trial Exhibit 10.13, 4/19/21. Williams's own statements in social media that he had no remorse demonstrates that his sentence must be sufficient to provide specific deterrence from committing future crimes

It was not until trial when Williams first claimed that he was remorseful for his conduct on January 6. That show of remorse came only when Williams, faced with overwhelming evidence of his guilt, had no choice but to confess during his trial testimony some of his criminal conduct on January 6; this Court should give it little weight now. Tr. Trans. at 62-63, 6/29/22, afternoon session. As such, a strong sentence is warranted here to promote deterrence. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

35

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

F.        **Unwarranted Sentencing Disparities**

As of the date of this sentencing memorandum, only seven Capitol Riot defendants have been sentenced for convictions under § 1512.  Of those, only three other defendants' behavior – that of Paul Hodgkins, Jacob Chansley, and Thomas Robertson – was similar to Williams's in that it did not involve a direct assault on a police officer or destruction of property. *See United States v. Paul Hodgkins*, 21-cr-118-RDM; *United States v. Jacob Chansley*, 21-cr-00003-RCL; and *United States v. Thomas Robertson*, 21-cr-00034-CRC.  Robertson's case is most instructive.

Thomas Robertson, a Rocky Mountain, Virginia police officer, attempted to block Metropolitan Police from crossing the west lawn by holding a wooden stick across his chest in a tactical stance. Like Williams, he was in the first wave of rioters to ascend the Northwest stairs to the Upper West Terrance and to enter the Capitol through the Senate Wing door.  Also, like Williams, Robertson was part of the crowd in the Crypt who overran the line of United States Capitol Police officers attempting to block rioters from pushing further into the building.  Similar to Williams, Robertson advocated on social media for the use of violence to overturn the election results, and following the riot, he bragged about his conduct on social media.  Following a guilty verdict at trial, Robertson (facing a Guidelines range of 87 to 108 months) was sentenced to 87 months' imprisonment. The only significantly distinguishing factors between Robertson and Williams are that Robertson had a direct (though not assaultive) confrontation with police, whereas Williams did not, and Robertson violated the conditions of his release by purchasing firearms. However, Robertson left the building after the line break in the Crypt when he was ordered by police to do so.  Conversely, following the line break in the Crypt, Williams continued onto the Rotunda where he defied officers' commands to leave the building and pushed with other rioters

in order to resist the line of police officers attempting to clear the area.  Williams also actively assisted other rioters in climbing the Northwest stairs by helping them climb bicycle racks they used to ascend the stairs.  In doing so, Williams assisted rioters in gaining access to the Upper West Terrace and the Capitol building itself.  Partially as the result of Williams's efforts, and as Captain Ortega described during the trial, after climbing the stairs, rioters attacked the line of Unites States Capitol Police that stood at the top of the stairs protecting the building.

Jacob Chansley, like Williams, was in the first wave of rioters to enter the Capitol through the Senate Wing door.  Unlike Williams, Chansley made it to the Senate floor and left a threatening note for then-Vice President Mike Pence on the Senate dais.  Following the riot, Chansley gave interviews to media outlets where – like Williams' expressions of pride on social media after the riot – Chansley gloated and said he considered January 6th "a win."  Chansley (facing a Guidelines range of 41 to 51 months) was sentenced to 41 months' imprisonment after the government recommended 51 months.  Importantly, Chansley's case is different from the instant one because Chansley accepted responsibility at a relatively early stage in his criminal proceedings and pled guilty to violating § 1512(c)(2).  Here, Williams has not accepted responsibility, and in fact, did not admit that he had assisted other rioters in climbing the Northwest stairs or that he had resisted the police in the Rotunda until he was pressed repeatedly about these subjects on cross-examination.

Paul Hodgkins unlawfully entered the Capitol and made it to the Senate floor carrying a Trump flag.  Hodgkins faced a Guidelines range of 15-21 months.  The United States requested 18 months' imprisonment and Hodgkins was sentenced to 8 months.  Hodgkins was the first defendant to be sentenced for a violation of § 1512(c)(2).  Hodgkins's case is readily distinguishable from

that of Williams.  Hodgkins almost immediately, and even before arrest, made a full confession to law enforcement officials.  He also pled guilty at a very early stage in his criminal proceedings. Conversely, Williams has taken no responsibility for his actions, bragged on social media, expressed pride in what he did, and called January 6th the proudest day of his life. He has also expressed no genuine remorse.  Hodgkins, unlike Williams, also was not among the first wave of rioters to enter the Capitol and did not assist in the efforts of the rioters to access the building.

Robertson and Chansley both received custodial sentences within the Guidelines range. The government requests that this Court similarly impose a Guidelines range sentence in this case. Doing so plainly would not create an unwarranted disparity. So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States,* 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).[6]

Therefore, for the reasons stated above, granting the government's instant recommendation would not constitute an unwarranted sentencing disparity.

---

[6] This Court imposed a Guidelines range sentence in *United States v. Greg Rubenacker*, D.D.C. 1:21-cr-00193. Rubenacker pleaded guilty to violating Section 1512(c)(2) and two less serious crimes, the Section 1512(c)(2) drove the Guidelines calculation. This Court sentenced Rubenacker to 41 months' incarceration after determining the Guidelines range was 41 to 51 months. May 26, 2022 Sentencing Hearing Tr. at 81-82, 159.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. [7] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

---

[7] The government or a governmental entity can be a "victim" for purposes of the VWPA and

§ 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[8]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in

---

MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).
[8] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Applying these principles to this case leads to the conclusion that Williams should be required to pay $2,000 in restitution. One of the offenses to which he was found guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii), Moreover, Williams's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 1512(c)(2)); Count 3 (18 U.S.C. § 1752(a)(2)), fall within the VWPA. As of April 5, 2022, the victim in this case, the Architect of the Capitol, estimates approximate losses suffered as a result of the siege at the United States Capitol at $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol. January 6 defendants who have pled guilty to one or more felony offenses have uniformly agreed to pay $2,000 in

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

restitution. *E.g. United States v. Cody Mattice and James Mault*, D.D.C., 1:21-cr-00657 (BAH), ECF 43 and 47 (plea agreements). Recognizing the practical and legal difficulties in allocating loss amounts across all January 6 defendants, including many who will be charged in the future, judges of this Court have likewise imposed restitution in the amount of $2000 on defendants convicted of one or more felonies following trial. *E.g., United States v. Guy Reffitt*, D.D.C. 1:21-cr-00032 (DLF), ECF 170 (judgment). This Court should do likewise and order Williams to pay $2,000 in restitution in this case.

## VIII.   THE GOVERNMENT'S RESPONSES TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

### Paragraph 15

Williams objects to paragraph 15 of the PSR and contends that he did not overrun the police in the Crypt. Williams bases his objection on his testimony at trial. He also alleges that CCTV in the Crypt shows that Williams was retreating from the police. Both contentions are without merit. The PSR is correct.

Williams testified at trial that the crowd in the Crypt all pushed forward and that he was caught up in the crowd. Trial Tr. at 56-57, 6/29/22, afternoon session.  Williams, however, made no effort to retreat from the police line.  CCTV video of the Crypt shows Williams enter the Crypt and immediately push through the crowd of rioters towards, not away from, the police line. Government's Trial Ex. 2.5, Williams also recorded himself walking through the crowd towards the police line. Government's Trial Exhibit 4.2.  Another rioter's video recording, Government's Trial Exhibit 5.0, and CCTV, Government's Trial Exhibits 2.6 and 2.31, also show Williams running with the crowd as they overrun the police line.

### Paragraph 27

43

Williams objects to paragraph 27 of the PSR and argues that he expects some reduction of the offense level for acceptance of responsibility. That objection is meritless. Williams never made any statements at any point in this case, to the government, to the jury, or the Court, in which he accepted responsibility for his criminal conduct on January 6, 2021. To the contrary, as was his right, Williams put the government to its burden of proof on every issue at trial and disputed essential factual elements of guilt. Indeed, Williams continues to maintain that he did not overrun the police in the Crypt as noted in his objection to paragraph 15 of the PSR. At trial, he falsely denied that he resisted officers in the Rotunda who were trying to force him out of the Capitol. Trial Tr. at 59, 6/29/22, afternoon session. Regarding his aiding and abetting other rioters in obstructing an official proceeding, and disorderly and disruptive conduct on restricted grounds, Williams denied that he helped rioters who were climbing the Northwest stairs until he was cross examined on the topic. Trial Tr. at 70 -73, 6/29/22, afternoon session. All of that is the antithesis of acceptance of responsibility.

**Paragraph 40**

Williams objects to paragraph 40 of the PSR and the eight-level increase under § 2J1.2(b)(1)(B) for causing or threatening to cause physical injury to a person, or property damage in order to obstruct the administration of justice. Application of this guideline is valid and consistent with this Court's recent holding in *Rubenacker*. There, this Court noted that the *Rubenacker* "was not one of the rioters who, on January 6th, merely walked inside the Capitol for a few minutes or seconds and then left with no encounter or engagement with any law enforcement officers." *Rubenacker*, Transcript of May 26, 2022 Sentencing Hearing ("Tr.") at 56. This Court emphasized that Rubenacker pled guilty to "joining the mob and chasing Officer Goodman up the

stairs outside the Senate Chamber, and then pointing and yelling at officers upstairs in the Ohio Clock Corridor at a time when Officer Goodman and the other officers were totally outnumbered." *Id*. at 56-57. Here too, Williams aided and abetted the flanking of officers on the Northwest stairs where rioters overran them and their police line. Williams is captured in another rioter's video helping rioters climb the Northwest stairs on the West Front of the Capitol by using bike rack as ladders as other rioters at the base of those stairs near Williams helped surround the police and push, shove, and curse them. *See* Government's Trial Exhibit 3.3.

United States Capitol Police Captain Ronald Ortega testified at trial that rioters such as Williams were working in tandem to overrun the police on the Northwest stairs. Trial Tr. at 21, 6/29/22, morning session. Captain Ortega further testified that the rioters's use of the bike racks as ladders to climb the stairs to flank the police on the Northwest stairs posed a threat to the Capitol Police. *Id*. The trial evidence proved that Williams was one of the rioters who participated in that flanking action.

Once the rioters overran the police on the Northwest stairs, Williams advanced to the Upper West Terrace. Williams is captured there in two videos stealing the Capitol Police Officers' water bottles, which were placed there by police to help abate the injuries they would sustain from the rioters' use of bear and pepper spray against them. *See* Government's Trial Exhibits 4.1, 5.4. Also, in one of Williams' videos, he declared that "*We have just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper sprayed, and hit everybody. Fuck that, we took this fucking building.*" *See* Government's Trial Exhibit 4.1. Williams' own statements emphasize that he was part of the mob that worked together to fight the police on the Northwest stairs, combat which subjected and threatened injury to the police as Williams and his fellow rioters advanced

into the Capitol to stop the Certification.

This Court stressed in *Rubenacker* that, "[a]ngry members of the mob including the defendant escalated the situation in the Rotunda. They refused to follow the orders of the police, overwhelmed law enforcement, and engaged in pushing and threatening - - the bottom line is: This is threating conduct." *Rubenacker* Sent. Tr. at 59. That is true here as well. Williams was in the Capitol for almost an hour as the police tried to move rioters out of the building. Tr. Trans. at 32, 79, 6/28/22, afternoon session. Williams countered the police's efforts by joining rioters who outnumbered and overran the police in the Crypt. *See* Government's Trial Exhibit 5.0. There, Williams stood menacing the police and waving his flag as the officers, including United States Capitol Police Officer Juan Lopez, tried to stop the crowd from further advancing through the Crypt. *See* Government's Trial Exhibit 5.0. Instead, Williams and his fellow rioters disobeyed the command of the police and overran them, with the crowd engulfing the police with Williams within two to five feet of Officer Lopez as he retreated. Officer Lopez testified that, "[a]t this point, after the line was breached, I was located towards the middle of the Crypt. I was thrown against a column as the crowd rushed through." Trial Tr. at 46. A screen shot from Government's Trial Exhibit 5.0 captures this scene as Officer Lopez was forced backwards into the column while Williams advanced with the mob around him.



Williams also actively resisted police who had to physically force him and other rioters out of the Rotunda. Instead of complying with their commands, Williams turned his back towards the officers and pushed against them. Trial Tr. at 55-56, 6/29/22, morning session.

Williams' actions at the Northwest stairs in assisting to flank officers, stealing the police officers' water bottles, overrunning the police in the Crypt where Officer Lopez was pinned against a pillar, and resisting the police in the Rotunda all constitute actions which threatened to cause physical injuries to the officers as part of Williams' obstruction of the administration of justice. Williams also previewed this violence at the Capitol in his pre-riot social media posts, which were laced with militaristic and violence-laden comments. *See* Government's Exhibits 9.0, 9.1, 9.3, 9.4, 9.6, 9.9, 9.10, 9.11, 9.12, 9.13, 9.14, 9.15, 9.21, 10.2, 10.4, 10.5, and 10.8.

## **Paragraph 75**

Williams disputes the description of the offense which led to his arrest on August 16, 2020 for disorderly person. Williams claims that he did not shout obscenities during the incident; he

claims that his co-defendant did. The Court should rely upon the report provided by Probation. This is based upon a report of the Riverview Police Department who arrested Williams.

IX.    **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 64 months, which is a mid-point of the sentencing guidelines range as calculated by the government, restitution of $2,000, and a total of $170 in special assessments for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:        */s/ Anthony L. Franks*
ANTHONY L. FRANKS
Missouri Bar No. 50217MO
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
For the District of Columbia
Telephone No. (314) 539-3995
anthony.franks@usdoj.gov


GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
(202) 598-3276
Grace.E.Albinson@usdoj.gov