UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

      v.                             Criminal Case No. 21- 377 (BAH)

ANTHONY WILLIAMS,

              Defendant.
_____/

## DEFENSE SENTENCING MEMORANDUM

Anthony Williams asks for a sentence of 15 months in custody followed by three years of supervision. This sentence is slightly below the defense's calculation of the guidelines range, is the low end of the range offered in the plea agreement, and would account for Mr. Williams's role as the primary caretaker for his disabled mother, his acknowledgement of regret, and his potential for rehabilitation.

A lengthier prison term will not serve the purposes of sentencing. Mr. Williams has learned from his experience and from listening to the testimony at trial and during jury selection.  He will not become involved in something like this ever again.. Unlike others, Mr. Williams did not come to Washington D.C. as part of a coordinated militia plan to stage an insurrection. He brought no weapons or

1

protective equipment. Rather, like many, he foolishly acted on strongly held (and widespread) beliefs about the election. Since January 6, he has committed himself to his painting work, and to assisting his mother, and he has shown that he can comply with the law by stopping his marijuana use and complying with all conditions of supervision while on pretrial release.

## I.
## Mr. Williams's History and Characteristics

Mr. Williams is 47 years old and has no prior felony convictions. He was born in Cook County, Illinois. Mr. Williams's father, a former marine, left when he was three years old. His father was a drywall contractor most of his life after his military service, and he died of suspected complications from Agent Orange exposure. Mr. Williams had essentially no relationship with him. His mother remarried another former marine, James Dolezal. Mr. Dolezal was unfortunately an alcoholic, and he abused both Mr. Williams and his mother. PSR ¶ 88. The couple divorced in the early 1990s, when Mr. Williams was still an adolescent.

Mr. Williams has never been married and has no children. He maintains a close relationship with his mother, Carol Ann Williams. She is 68 years old and lives with him in Southgate, Michigan. Southgate is a suburb of Detroit that is part of the "Downriver" community. It is generally known as a working-class residential area, historically populated by people working in Detroit's automobile factories.

Mr. Williams's mother moved to Michigan shortly after Mr. Williams relocated to the area in 2014 so that he could help take care of her. She is a former waitress and office worker. But nine years ago she had a brain aneurysm, and she is now on disability. She suffers chronic obstructive pulmonary disease, hypokalemia, emphysema, and the aftereffects of her aneurysm and potential lung cancer. She is on oxygen and has limited mobility and relies on Mr. Williams to help with the activities of daily living.

The Probation Office has identified that a variance may be warranted because Mr. Williams "is the primary caregiver for his mother," and is "the primary wage earner for his household, which includes his mother." PSR ¶ 157. As his mother told probation, "she does not receive enough social security income to be financially independent, so she is very concerned and stressed about any potential term of incarceration, as she will then be 'homeless.'" PSR ¶ 85.

Mr. Williams dropped out of high school in 12th grade. He then successfully earned his GED in 1996. He has long been a hard worker, primarily as a painter. He joined a trade union for painting in 1996 and has continued to work in the field for two decades. He is a qualified union painter through the Department of Labor.

A close friend describes how Mr. Williams is committed to his work and how he often goes out of his way to help others. (Ex. 1, Fisher Letter.) She describes him

3

as hardworking and a man with a big heart. Others echo this sentiment, praising his work ethic and trustworthiness. (Exs. 2, 3, Dengel Letters, Ex. 4, Green Letter.) Even those who disagree with him politically trust him and believe that he will be a positive member of the community in the future.

Mr. Williams came to Michigan in 2014 hoping to assist a friend with a new medical marijuana dispensary. That project fell through, and he again picked up work as a painter and continued that work through the pendency of this case. As hobbies, Mr. Williams collects and restores classic cars. He also enjoys photography and travel. When he can afford it, he has traveled to Jamaica. He has been unable to travel overseas during this case.

Mr. Williams also enjoys reading about history, especially World War II. His grandfather served under Dwight Eisenhower, which is why he took the photograph of himself with the Eisenhower statute in the U.S. Capitol. Mr. Williams's interest in history had taken him to D.C. at least once before when he attended the inauguration of Barack Obama, whom he supported.

Before this case, Mr. Williams had used marijuana for nearly 30 years, since the time he was 18 years old. He used it daily. During his time on bond, he has discontinued use and complied with all conditions.

4

## II.
## Sentencing Guidelines

Mr. Williams respectfully requests this Court adopt a range of 18 to 24 months. His range differs from probation in two respects.

### A. Acceptance of Responsibility and the Trial Tax

First, Mr. Williams respectfully asks the Court to consider a reduction in offense level for acceptance of responsibility under USSG § 3E1.1. In determining the propriety of a reduction under this section, courts should consider, among other things, whether the defendant truthfully admitted conduct comprising the offenses of conviction and post-offense rehabilitative efforts. *Id.* § 3E1.1, cmt. n.1(A), (G). Although the adjustment generally does not apply to a defendant who denies essential factual elements of guilt at trial, conviction by trial "does not automatically preclude a defendant from consideration for such a reduction," and in "rare situations," the "defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.* § 3E1.1, cmt. n.2.

Although Mr. Williams disputed the government's view of his intent in entering the Capitol, he did not deny the accuracy of the government's evidence of his conduct in the Capitol or of any of the social-media evidence. On the contrary,

5

on the stand, he expressed remorse for taking part in the events at the Capitol on January 6, explaining that he regrets being part of a destructive mob and the further political divisions it has caused. He also explained that seeing jurors discuss the negative effect of January 6 on their lives made him realize the impact of his actions. (Trial Transcript, June 29, 2022, Afternoon Session, at 62–63.)

In any event, this Court should vary downward to avoid a trial tax. Before trial, the government offered Mr. Williams a plea to the most serious offense charged with an advisory range of 15 to 21 months. The government now seeks a sentence of 64 months, with a proposed range of 57 to 71 months. No policy rationale supports an enhancement so severe. And it creates unwarranted sentence disparities between similarly situated defendants.

Over 95% of federal defendants plead guilty. This demise of the trial undermines the broader criminal justice system because most rights held sacred by the system are tied directly or indirectly to trial. When the trial rate is so high that these rights are virtually pled out of existence, the criminal justice system as whole suffers. This expected absence of trial by repeat players creates perverse incentives that undermine the purported truth-finding function of a criminal trial. It diminishes incentives for prompt Rule 16 disclosure by prosecutors and investigation by defense lawyers, and "reduces transparency and for that reason alone diminishes the quality of justice." *United States v. Kupa*, 976 F. Supp. 2d 417, 451 (E.D.N.Y. 2013).

6

There is "near unanimity that the federal sentencing guidelines are responsible for the decline in the criminal trial." Patricia Lee Refo, *The Vanishing Trial*, ABA J. of Sec. of Litigation, Vol. 30 No. 2, at 3 (2004), https://perma.cc/5KBK-XEUG. These critics agree that the Guidelines "impose a substantial penalty on a defendant who chooses to exercise his right to a trial—and since they appear to have been designed to encourage or coerce, depending upon your view, defendants to enter into plea agreements, they appear to be working." *Id.* In light of this trend, Human Rights Watch called on federal judges to end the trial penalty by ensuring that "defendants receive sentences reflecting their crimes, not their willingness to plead." Human Rights Watch, *An Offer You Can't Refuse*, at 12, Dec. 5, 2013, https://perma.cc/FE4H-WSS7.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (cleaned up). Yet the Guidelines' trial tax does just that. This is, at least in part, because the Guideline is framed as a "reward" for accepting responsibility rather than as a "punishment" for going to trial. *See, e.g., United States v. Cervantes-Rubio*, 275 F. App'x 601, 604 (9th Cir. 2008). But, as Judge Murnaghan of the Fourth Circuit wrote, "It approaches sophistry to say in one breath that one may not be punished for exercising one's constitutional right to stand trial,

7

and, then to say with the other, but, because he has demonstrated repentance by pleading guilty, he may have made out better." *United States v. Iager*, 849 F.2d 607 (4th Cir. 1988) (Murnaghan, J., dissenting). Judge Wald of the D.C. Circuit observed that whether a court "raise[s] [a man's] sentence because he went to trial or denie[s] [him] a shorter sentence for the same reason is irrelevant because his constitutional right was burdened either way." *United States v. Jones*, 997 F.2d 1475, 1487 (D.C. Cir. 1993) (Wald, J., dissenting).

The trial tax does not "promote respect for law," and thus provides an additional reason to reject the trial tax. Justice Harlan wrote that the jury trial "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law." *Duncan v. Louisiana*, 391 U.S. 145, 187 (1968) (Harlan, J., dissenting). That process had meaningful results in this case, as the jury trial in this case forced Mr. Williams to reconcile with the effects of his participation in the events of January 6 and the impact it had on this country. This Court should be careful not to impose sentences that over-incentivize pleas and therefore risk eliminating a critical means by which the system promotes respect for the law in the eyes of the citizenry.

### B. Mr. Williams did not threaten physical injury to a person

Second, Mr. Williams objects to the eight-level increase under § 2J1.2(b)(1)(B) for causing or threatening physical injury to a person in order to

obstruct the administration of justice. For § 2J1.2(b)(1)(B) to apply, the government must prove by a preponderance that Mr. Williams communicated an intent to inflict physical injury on another. *See United States v. Ulibarri*, 115 F. Supp. 3d 1308, 1336 (D.N.M. 2015). Mr. Williams neither actually caused physical injury to anyone nor threatened to cause physical injury to anyone.

In *United States v. Rubenacker*, the Court applied this enhancement because Mr. Rubenacker's "physical movements inside the Capitol communicated threats to law enforcement." *United States v. Rubenacker,* 22-3036, Dkt. 70, at 56 (D.D.C. May 26, 2022). The Court emphasized that Mr. Rubenacker chased an officer (Capitol Police Officer Goodman) up a flight of stairs outside the Senate Chamber, and then pointed and yelled at outnumbered officers "in an agitated manner with his finger outstretched" in a threatening manner. *Id.* at 57–58. The Court found: "His pursuit of Officer Goodman up the stairs into the Ohio Clock Corridor, in blatant disregard for this officer's instructions to stand back and leave, as the crowd of angry, yelling rioters swelled around him, constituted a clear and direct threat to the safety of Officer Goodman and could have led to Officer Goodman's physical injury." *Id.* at 57.

Moreover, Mr. Rubenacker, "swung a plastic bottle at an officer's head; sprayed liquid from his bottle across multiple officers who are seen on the video

9

footage to flinch in response," all "[i]n direct defiance of the officers' attempts to clear the area." *Id.* at 58–59. This, too, was threatening conduct, especially "given the amount of tear gas and other chemical sprays being deployed, both by rioters and by the police." *Id.* at 59.

In contrast, although he was part of the crowd on January 6, and is convicted of an intent to obstruct an official proceeding, there is no evidence that Mr. Williams threatened physical injury to any officers by shouting threats, chasing officers, or swinging his fists or other objects at officers.

### III.
### Nature of the Offense

Mr. Williams regrets his choice to enter the Capitol and acknowledges that the events of January 6, 2021, were serious. The government calls him "remorseless," but that is not accurate. He explained at trial, "looking back on it now, I do have remorse that people were injured, that there was loss of life, that some of the property was destroyed, and about how it created further divisions in our country between the parties." (Trial Transcript, June 29, 2022, Afternoon Session, at 62–63.) He also explained that jurors describing how these events affected them personally especially influenced him.

Counsel notes that Mr. Williams did not engage in direct physical violence or act in coordination with any extremist group. Rather, he traveled to the Capitol with

friends and went along with the crowd after others started to trespass. The government emphasizes Mr. Williams's rhetoric on social media, but as the case agent acknowledged at trial, many of Mr. Williams's social-media posts repeated mainstream "conspiracy theories" that he could see in a diner in his hometown of Southgate on Fox News. Looking at his actual conduct, Mr. Williams did not engage in type of violent conduct that would warrant a sentence of over five years in prison.

## IV.
### Deterrence, Just Punishment, and Protection of the Public

A lengthy prison term will not further the goals of specific deterrence. Investigators in this case quickly identified Mr. Williams as one of the hundreds of people who entered the Capitol on January 6. He was promptly arrested and charged. By acting so quickly to identify those who trespassed at the Capitol, the FBI and the government have already deterred Mr. Williams personally with their investigation and swift action. The deterrent effect of these actions is shown by his compliance with terms of pretrial release. Law enforcement has also demonstrated to others that those who trespass at the Capitol will be investigated quickly.

After the charges were filed, Mr. Williams's face and name were splashed across the internet in articles announcing his arrest and charges. This public shaming has already accomplished many of the goals of sentencing. The Internet allows the

re-emergence of public shaming as an effective punishment tool, as many of the same "cultural conditions" now exist as during America's early years, when "public shaming thrived." *See* Lauren M. Goldman, *Trending Now: The Use of Social Media Websites in Public Shaming Punishments*, 52 AM. CRIM. L. REV. 415, 443 (2015) (discussing how public shaming furthers the goals of sentencing). "Shaming has returned. The internet and technological developments created a new 'global village.' In the digital age, the scope of shaming is extensive." Michal Lavi, *The Good, the Bad, and the Ugly Behavior*, 40 CARDOZO L. REV. 2597, 2601 (2019).

Here, Mr. Williams's community knows of his crime. Even without incarceration, other potential offenders are likely to avoid a similar offense on seeing how quickly he was caught and prosecuted. This idea is consistent with research demonstrating "that the chance of being caught is a vastly more effective deterrent than even draconian punishment," and "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime." DOJ, *Five Things About Deterrence, supra.*

There is no need to incarcerate Mr. Williams to protect the public. Although Mr. Williams does not have a spotless criminal record, he is not a dangerous man. He has never been convicted of a felony offense.

A term of imprisonment will undermine rather than advance the goals of rehabilitation. Research consistently shows that incarceration is not an effective way

to change behavior and, more often, has a criminogenic effect. Thorough analysis concludes that incarceration has no effect on recidivism. *See* Damon M. Petrich, *et al.*, *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 Crime & Justice (2021).

Of the sentencing factors to consider, retribution is what remains. There are better ways than a long prison sentence to heal the wounds caused by January 6 and Mr. Williams's role in the offense. Mr. Williams will pay restitution towards repairing the Capitol. He also would agree to engage in community service as part of his term of supervised release. Requiring that Mr. Williams give back to the community through service is another way this Court's sentence can encourage reconciliation.

## V.
## The Need to Avoid Unwarranted Sentence Disparities

Nearly all of the defendants who have received prison sentences comparable to what the government seeks in this case were either members of militia groups, carried weapons to the Capitol on January 6, or physically assaulted officers. Mr. Williams is not the member of any militia group and committed no direct acts of physical violence and did not destroy property. Moreover, unlike most of these defendants, Mr. Williams did not come to Washington D.C. with any type of

protective gear or riot equipment, like zip ties or ropes. He also did not enter the Senate chamber, but rather stopped and milled about in the Rotunda, where many other people congregated. And, unlike many of the defendants, he did not intentionally destroy evidence about his involvement in the events of January 6 after the fact. A 15-month prison sentence in this case would be consistent with the sentences imposed for similar conduct.

Relatively few of the January 6 defendants have been convicted under 18 U.S.C. § 1512. But among those who have, Mr. Williams is the most comparable to Paul Hodgkins, 21-cr-00188, who received a prison sentence of 8 months—below the guidelines and the government's recommendation of 18 months' incarceration. It is true that Mr. Hodgkins pleaded guilty early. But unlike Mr. Williams, Mr. Hodgkins came to Washington D.C. ready for a fight: He brought protective eye goggles, rope, and white latex gloves. *Id.*, Dkt. 32, Gov. Sent. Mem., at 1. Also unlike Mr. Williams, Mr. Hodgkins did not stop in the Rotunda, but entered the Senate chamber where he saluted others shouting and cheering there. *Id.* Like Mr. Williams, Mr. Hodgkins did not personally engage in violence or property destruction. *Id.* Mr. Williams asks for a sentence longer than Mr. Hodgkins, but not dramatically so.

Mr. Williams's conduct stands in stark contrast to other people convicted under § 1512. For example, Guy Reffitt, 21-cr-00032, received a sentence of 87

14

months, well below the government's recommendation of 180 months. Mr. Reffitt was a member of an organized militia group and came to the Capitol armed with a gun and police-style flexicuffs and wearing a tactical helmet and bulletproof armor. *Id.*, Dkt. 158, Gov. Sent. Mem., at 5. He also recruited another man and helped him assemble an AR-15 for the trip. *Id.* at 6. He expressed an intent to use his gun and flexicuffs to forcibly drag legislators out of the building and take over Congress. *Id.* at 1. He also actively penetrated the scaffolding around Congress by cutting down a tarp and encouraged others to charge forward at officers. *Id.* at 5. After the riot, Mr. Reffitt intentionally purged conversations with militia leaders from his iPhone and threatened his own children with shooting if they turned him into the FBI. *Id.* at 1, 6. For Mr. Williams, who is the member of no militia group and did not come armed or in tactical gear, and did not destroy evidence or threaten his own family, a sentence significantly lower than Mr. Reffitt—certainly more than just two years less—is appropriate.

Scott Fairlamb, 21-cr-00120, received a prison sentence of 41 months, and the government sought a sentence of 44 months. Mr. Fairlamb, a former Mixed Martial Arts fighter, took a police baton and brandished it while screaming at officers that he would "disarm them." *Id.*, Dkt. 50, Gov. Sent. Mem., at 1. He repeatedly verbally harassed officers and got in the officers' faces pointing his finger at them. *Id.*, at 17-

18. He also shoved an officer and punched his face shield, and after the riot posted a video on social media threatening future violence. *Id.*, at 2. Unlike Mr. Fairlamb, Mr. Williams did not use a weapon and did not punch an officer. A prison sentence shorter than Mr. Fairlamb's is appropriate.

Duke Wilson, 21-cr-00345, received a prison sentence of 51 months. Mr. Wilson "engaged in several acts of violence against police officers," including "punching them, attempting to take their shields, and throwing objects at them." *Id.*, Dkt. 29, Gov. Sent. Mem., at 1-2. He picked up what appeared to be a PVC pipe and "indiscriminately struck at the officers with it." *Id.* at 12. Mr. Williams engaged in no such acts of physical violence.

Matthew Miller, 21-cr-00075, received a prison sentence of 33 months. Outside the Capitol building, Mr. Miller encouraged other rioters to get closer to the Capitol and threw a full beer can at officers. *Id.*, Dkt. 67, Gov. Sent. Mem., at 17. Once inside the Capitol, Mr. Miller "urged other rioters to push against the police; threw batteries at police officers; and Miller ultimately released the contents of a fire extinguisher, a dangerous weapon when used as Miller did, directly onto law enforcement officers." *Id.* The government seeks a prison sentence almost double of Mr. Miller's sentence in this case, and it is unwarranted given that Mr. Williams did not engage in the type of violence that Mr. Miller did.

There is also Greg Rubenacker, 21-00193, who this Court sentenced to 41 months. Unlike Mr. Williams, Mr. Rubenacker entered the Capitol within 60 seconds of the initial breach of the building. *Id.*, Dkt. 56, Gov. Sent. Mem., at 2. As discussed earlier, he chased an officer through the Capitol and ignored the officer's demands to back up. *Id.* He berated officers and screamed for officers to "Go arrest the Vice President!" *Id.* He then exited the building and entered *again* where he confronted officers and swung a water bottle at an officer's head. *Id.* He left only after being sprayed with a chemical irritant. *Id.* After the riot, he researched methods for concealing evidence of his criminal activity. *Id.* at 3. Mr. Williams did not chase officers or swing objects at them, and he did not seek to conceal evidence.

The government claims that this case is like that of Thomas Robertson, 21-cr-00034-CRC. It is not. Mr. Robertson was a trained police officer, and he used his law enforcement training to block officers from responding to the riot. *Id.*, Dkt. 124, at 1. He came ready for violence, bringing a gas mask and a weapon, a large wooden stick. *Id.* at 4. He then used the stick during a direct confrontation with police by holding it across his chest in a tactical stance to block officers, and striking two officers. *Id.* at 5-6. After the riot, he destroyed evidence, including his phone and the phone of a friend who participated in the riot. *Id.* at 9. He then violated the terms of his pretrial release by purchasing more than 30 firearms, including an M4 rifle and

a partially-assembled pipe bomb. *Id.* at 10-11. Williams, in contrast, had no police training, brought no weapons to the Capitol, had no direct physical confrontation with the police, and has fully complied with pretrial release.

The government seeks a higher sentence than that imposed for Jacob Chansley, 21-cr-00003-RCL. That would be unfair. Mr. Chansley was one of the first rioters to storm the Senate floor, where he screamed obscenities and left a threatening note for Vice President Pence. *Id.*, Dkt. 81, Gov. Sent. Mem., at 9. He carried a pole with a spear at the tip. *Id.* at 5. He used a bullhorn to rile up the crowd and pushed back police. *Id.* at 7-8. Mr. Williams never entered the Senate floor, nor did he make specific direct threats. A lower sentence is warranted for Mr. Williams.

Many who engaged in similar conduct to Mr. Williams did not receive felony convictions and have received sentences substantially lower than 15 months. In *United States v. Jacob Hiles*, No. 21-CR-155 (ABJ), Judge Jackson imposed a sentence of 24 months' probation, 60 hours of community service, and $500 restitution. Mr. Hiles marched to and entered the Capitol wearing goggles to protect himself from tear gas. He posted videos and photos of himself on Facebook, including one where he and his cousin were smoking in the Capitol. *Id.,* R. 24, Statement of Offense. Jeffrey Witcher received a sentence of 12 months' probation with 60 hours of community service. He entered the Capitol early in the attack and traveled to multiple locations. While inside, he yelled at law enforcement officers,

18

"Our House! Don't be a traitor! Fulfill your constitutional duties, man. Do or die! Be with us!" *United States v. Jeffrey Witcher*, No. 21-CR-235 (RC), R. 20, Statement of Offense.

In *United States v. Joshua & Jessica Bustle*, No. 21-CR-238 (TFH), the Bustles pleaded guilty to parading and received probationary sentences. Like Mr. Williams, they were in the Rotunda, and one of them posted on Facebook during the riot, and then subsequently called for a revolution. *Id.,* R. 25, Statement of Offense. After climbing a wall, being maced, and crawling through a broken window, Amy and John Schubert also traveled to the Rotunda, through adjacent hallways, and even entered at least one Congressional meeting room. *United States v. Amy Schubert & John Schubert*, No. 21-CR-588 (ABJ), R. 17, Statement of Offense. In addition to the probationary sentence, Judge Jackson ordered Amy and John to pay $2,000 and $1,500 fines respectively and to complete 100 hours of community service.

In short, a 15-month prison sentence will not create unwarranted disparities between defendants who entered and remained in the Rotunda but did not otherwise cause injury to police or engage in coordination with militia groups.

## CONCLUSION

A sentence of 15 months is sufficient but not greater than necessary to achieve the goals of punishment.

Respectfully submitted,

s/ Benton C. Martin
s/ James R. Gerometta
FEDERAL COMMUNITY DEFENDER
Attorney for Anthony Williams
613 Abbott St., Ste. 500
Detroit, MI  48226
313-967-5832
E-mail: Benton_Martin@fd.org

Date:  September 5, 2022